19 P.3d 699

James FUJIMOTO, Virginio Lista, Duane Owan, Mitchell Owan, Michael Mc-Donald, James Takamiya, and Gary Hashimoto, Plaintiffs/Counterclaim Defendants–Appellants and Appellees,

v.

Gordon AU, Defendant/Cross–Claim Defendant/Cross–Claim Plaintiff/Counterclaimant Appellee,

Bruce Sutherland, Nancy Sutherland, Larry Sky, Bon Ja Sky, Defendants/Cross–Claim Plaintiffs/Cross–Claim Defendants–Appellees,

Richard Jorgensen, Defendant/Cross–Claim Defendant–Appellee and Cross–Appellant,

Mickey Hewitt, B.J. Kim, Defendants/Cross–Claim Defendants–Appellees,

William G. Weimer, Sandra Weimer, Ross Kaaa, Kailua Partners, Defendants/Cross–Claim Defendants–Appellees,

Tom Pesce, Kailua Estates Partners, Defendants/Cross–Claim Defendants,

John Does 1–10, Jane Does 1–10, Doe Partnerships 1–10, Doe Corporations 1–10, Doe Entities 1–10, and Doe Governmental Units 1–10, Defendants.

No. 22406.

Supreme Court of Hawai'i.

Feb. 22, 2001.

Reconsideration Denied March 14, 2001.

Joy Yanagida, appellant, appearing pro se, on the briefs, and for plaintiffs/counterclaim defendants-appellants and appellees James Fujimoto, Virginio Lista, Duane Owan (aka Dwayne Owan), Mitchell Owan, Michael McDonald, James Takamiya, and Gary Hashimoto.

Leslie H. Kondo, Michael D. Tom, and Lyle M. Ishida (of Tom & Petrus), on the briefs, Honolulu, for defendant/cross-claim defendant-appellee and cross-appellant Richard Jorgensen.

Reuben S.F. Wong and Russell Y. Tsuji, on the briefs, Honolulu, for defendant/cross-claim defendant/cross-claim plaintiff/counter-claimant-appellee Gordon Au.

LEVINSON, Acting C.J., NAKAYAMA, RAMIL, JJ., and Circuit Court Judge MARKS, in place of MOON, C.J., Recused, and Circuit Court Judge KOCHI, Assigned by Reason of Vacancy.

Opinion of the Court by LEVINSON, J.

The plaintiffs/counterclaim defendants-appellants and appellees James Fujimoto, Virginio Lista, Duane Owan, Mitchell Owan, Michael McDonald, James Takamiya, and Gary Hashimoto (collectively, "the plaintiffs") appeal from: (1) the judgment, filed on April 19, 1999, in favor of the defendant/ cross-claim defendant/cross-claim plaintiff/counter-claimant-appellee Gordon Au and against the plaintiffs on all claims asserted in the plaintiffs' complaint, pursuant to summary judgment orders, and awarding Au $42,515.10 in attorneys' fees and costs; (2) the judgment, filed on April 19, 1999, in favor of the defendant/cross-claim defendant-appellee Mickey Hewitt and against the plaintiffs on all claims asserted in the plaintiffs' complaint, pursuant to summary judgment orders, and awarding Hewitt $11,463.27 in attorneys' fees and costs; and (3) the "judgment," filed on April

20, 1999, in favor of the defendant/cross-claim defendant-appellee and appellant Richard Jorgensen and against the plaintiffs, awarding Jorgensen $34,310.05 in attorneys' fees and costs. The plaintiffs' counsel, Joy Yanagida, appeals (1) the order, filed on February 24, 1999, awarding attorneys' fees and costs to Au in the sum of $3,698.30 and to Jorgensen in the sum of $7,591.48, all to be paid personally by Yanagida and (2) the final judgment, filed on April 20, 1999, in favor of Jorgensen and against Yanagida, awarding Jorgensen $7,591.48 in attorneys' fees and costs. Jorgensen cross-appeals the "judgment," filed on April 20, 1999, in favor of Jorgensen and against the plaintiffs, awarding Jorgensen $34,310.05 in attorneys' fees and costs.

On appeal, the plaintiffs argue that the circuit court erred in: (1) dismissing the plaintiffs' derivative claims pursuant to Hawaiʻi Rules of Civil Procedure (HRCP) Rule 23.1 (1996);[1] (2) sanctioning the plaintiffs, pursuant to HRCP Rule 11 (1996),[2] for HRCP Rule 23.1 violations in filing their derivative claims; (3) granting summary judgment in favor of Jorgensen and Au with respect to all of Fujimoto's claims on the grounds of lack of standing and denying Fujimoto an opportunity to obtain ratification, joinder, or substitution of the proper party pursuant to HRCP Rule 17(a) (2000);[3] (4) granting Jorgensen's and Au's motions for summary judgment with respect to all of the plaintiff's claims (a) without considering the testimony of the plaintiffs' experts, (b) by relying on the representations of Au's counsel, and (c) by relying on depositions during which the plaintiffs were not allowed to cross-examine the deponents; (5) concluding

1. HRCP Rule 23.1 (1996), entitled "Derivative Actions by Shareholders," provided:

 In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law. The complaint shall also allege with particularity the efforts made by the plaintiff to obtain the action he desires from the directors or comparable authority and from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs.

2. HRCP Rule 11 (1996) provided in relevant part:

 Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated.... The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that

 to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

 HRCP Rule 11 was substantially revised in 1999, *see infra* note 21.

3. HRCP Rule 17(a) provides:

 (a) **Real Party in Interest.** Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in his own name without joining with him the party for whose benefit the action is brought. No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been

that Au and Jorgensen were entitled to summary judgment as a matter of law; (6) awarding attorneys' fees jointly and severally against the plaintiffs without statutory authority; and (7) awarding costs jointly and severally against the plaintiffs without statutory authority.

Yanagida, in turn, argues on appeal that the circuit court erred in: (1) sanctioning her (a) without affording her an opportunity to be heard, (b) even though she did not violate any order of the court, and sanctioning her on the basis of HRCP Rule 11, *see supra* note 2, when no violation of the pleading rules was involved; and (2) requiring her to pay an unreasonable sum as a sanction.

Jorgensen argues on appeal that the circuit court erred in: (1) limiting the amount of costs recoverable by Jorgensen, pursuant to Hawaiʻi Revised Statutes (HRS) § 607–9 (1993) and HRCP Rule 54(d) (1999);[4] and (2) limiting the amount of attorneys' fees recoverable by Jorgensen, pursuant to HRS § 607–14 (1993 & Supp.1999).[5]

This court does not have jurisdiction over the appeal and cross-appeal of the "judgment" in favor of Jorgensen and against the plaintiffs, filed on April 20, 1999, inasmuch as the document filed by the circuit court does not expressly enter judgment in Jorgensen's favor with respect to the plaintiffs' substantive claims against him, but merely refers to the entry of the summary judgment orders

that disposed of those claims. *Jenkins v. Cades Schutte Fleming & Wright,* 76 Hawaiʻi 115, 119, 869 P.2d 1334, 1338 (1994). Absent entry of an appealable final judgment on the claims against Jorgensen, the award of attorneys' fees and costs is likewise not appealable.

We agree with the plaintiffs that the circuit court erred in entering summary judgment against them and in favor of Au and Hewitt. Furthermore, we agree that the circuit court erred in awarding Au and Hewitt attorneys' fees, pursuant to HRS § 607–14, inasmuch as the present action is not in the nature of assumpsit. However, we need not and do not reach the question whether the circuit court abused its discretion in imposing attorneys' fees and costs against the plaintiffs jointly and severally. We hold that the circuit court erred in dismissing Fujimoto's claims, which were asserted in the plaintiffs' complaint, inasmuch as Fujimoto had the right to ratification of his action by J & J Auto Repair, Inc. We hold that the circuit court likewise erred in dismissing the plaintiffs' derivative claims, inasmuch as the plaintiffs substantially complied with the requirements of HRCP Rule 23.1; accordingly, the circuit court abused its discretion in imposing sanctions, pursuant to HRCP Rule 11, against the plaintiffs for filing the derivative claims. Regarding Yanagida's appeal, we hold that the circuit court erred in relying

commenced in the name of the real party in interest.

4. HRS § 607–9 provides:
 **Cost charges exclusive; disbursements.** No other costs of court shall be charged in any court in addition to those prescribed in this chapter in any suit, action, or other proceeding, except as otherwise provided by law.
 All actual disbursements, including but not limited to, intrastate travel expenses for witnesses and counsel, expenses for deposition transcript originals and copies, and other incidental expenses, including copying costs, intrastate long distance telephone charges, and postage, sworn to by an attorney or a party, and deemed reasonable by the court, may be allowed in taxation of costs. In determining whether and what costs should be taxed, the court may consider the equities of the situation.
 HRCP Rule 54(d) provides in relevant part that, "[e]xcept when express provision therefor is made either in a statute or in these rules, costs

shall be allowed as of course to the prevailing party unless the court otherwise directs[.]"

5. HRS § 607–14 provides in relevant part:
 In all the courts, in all actions in the nature of assumpsit and in all actions on a promissory note or other contract in writing that provides for an attorney's fee, there shall be taxed as attorneys' fees, to be paid by the losing party and to be included in the sum for which execution may issue, a fee that the court determines to be reasonable; provided that the attorney representing the prevailing party shall submit to the court an affidavit stating the amount of time the attorney spent on the action and the amount of time the attorney is likely to spend to obtain a final written judgment, or, if the fee is not based on an hourly rate, the amount of the agreed upon fee. The court shall then tax attorneys' fees, which the court determines to be reasonable, to be paid by the losing party; provided that this amount shall not exceed twenty-five per cent of the judgment.

upon Yanagida's purported violation of a prior court order in sanctioning her for failure to produce her clients at scheduled depositions. Accordingly, we (1) vacate (a) the circuit court's judgments, filed on April 19, 1999, in favor of Au and Hewitt and against the plaintiffs, (b) the circuit court's order, filed on June 19, 1997, to the extent that it dismissed the plaintiffs' derivative claims and imposed sanctions on them, (c) the circuit court's order, filed on February 24, 1998, awarding Au and Jorgensen $11,289.78, and (d) the circuit court's judgment, filed on April 20, 1999, in favor of Jorgensen and against Yanagida and awarding Jorgensen $7,591.48, and (2) remand the case to the circuit court for further proceedings consistent with this opinion.

## I. BACKGROUND

These appeals arise from a civil lawsuit involving Kailua Estates Partners (Kailua Estates) and Kailua Partners, which are limited partnerships purportedly formed for the purpose of purchasing and developing a parcel of land located on the island of Maui. The parcel was owned by Bruce and Nancy Sutherland (the Sutherlands), Larry and Bon Ja Sky (the Skys), and Tom Pesce (collectively, "the landowners"). William G. Weimer (Weimer) and Bomani J. Kim acted as promoters, general partners, and managers of the partnerships. The Sutherlands and Weimer were licensed real estate agents and/or brokers on the island of Maui. Initially, Kailua Estates formed a joint venture with the landowners to develop the parcel, but subsequently entered into a joint venture with Kailua Partners to purchase the parcel from its owners for the purpose of developing it.

The plaintiffs are among the investors in the partnerships. They are unsophisticated in investment and financial matters. Fujimoto is a sixty-seven-year-old retired owner of an automobile repair shop. He has a high-school level education. Takamiya is a sixty-six-year-old owner and operator of a store. Hashimoto is a sixty-five-year-old retired state employee with a high-school level education. Lista is an elderly Filipino immigrant and an owner of an auto body shop. Duane Owan was a manager of a carpet store, and Mitchell Owan was an owner of a flooring store at the time of their investments. McDonald is an orthopaedic surgeon who invested in Kailua Partners because of Au's credentials and also because of Hewitt's participation in the joint venture. Most, if not all, of the plaintiffs were recruited to invest through Kim's solicitation. The promoters of the partnerships distributed memoranda of private offering and copies of a limited partnership agreement and a subscription agreement to the prospective investors. The plaintiffs' decisions to invest were made in reliance on the representations contained in the foregoing materials, as well as on their discussions with Kim. None of the investors received any return on their investments, and they have been unable to obtain any information regarding the status of the funds they entrusted to the partnerships.[6]

On June 3, 1996, the plaintiffs filed a complaint against both partnerships, generally, as well as against Au, Jorgensen, Hewitt, Weimer, Kim, the Sutherlands, the Skys, Pesce, Sandra Weimer, and Ross Kaaa, individually. They alleged that Weimer, Kim, Hewitt, Jorgensen, and Kaaa were general partners of Kailua Estates and that Weimer, Kim, and Au were general partners of Kailua Partners. Fujimoto asserted that he had invested $25,000.00 in Kailua Estates on July 5, 1991; the remaining six plaintiffs asserted that they had invested sums ranging from $12,500.00 to $50,000.00 in Kailua Partners between February 2, 1992 and April 29, 1992. The plaintiffs' investments in the two part-

---

6. On July 9, 1998, Weimer was indicted on twenty-two counts of mail fraud in the United States District Court for the District of Hawai'i in connection with his role in Kailua Estates and Kailua Partners. He eventually entered a no contest plea. On December 15, 1998, the State of Hawai'i Department of Commerce and Consumer Affairs (DCCA) issued a "final order as to Kailua Estates, Kailua Partners, and William Weimer" to cease and desist from selling any securities within the state of Hawai'i, rescinding all contracts regarding the sale of securities they had made with Hawai'i investors, and ordering them to refund to these investors any consideration received with interest and to pay a penalty in the sum of $50,000.00 with interest to the state of Hawai'i. On February 12, 1999, DCCA issued a substantially identical order as to Kim.

nerships totaled $275,000.00. The plaintiffs' complaint stated the following claims for relief: (1) unfair and deceptive trade practices, in violation of HRS ch. 480 (Count One); (2) violations of the securities laws, pursuant to HRS ch. 485 (Count Two); (3) violations of the Limited Partnership Act, HRS ch. 425D (Count Three); (4) breach of fiduciary duty (Counts Four and Six); (5) intentional and/or negligent misrepresentation (Count Five); (6) actual and/or constructive fraud (Counts Four and Six); (7) civil conspiracy (Count Seven); (8) unjust enrichment (Count Eight); (9) breach of contract (Count Nine); (10) derivative claims, mirroring those alleged in Counts One through Nine, on behalf of the partnerships (Count Ten);[7] and (11) a claim against the Real Estate Recovery Fund (Count Eleven). By way of relief, the complaint prayed for rescission, damages, the imposition of a constructive trust, an injunction, and attorneys' fees and costs.

On June 19, 1996, the plaintiffs filed an amended complaint. Yanagida signed the original and amended complaints, although neither contained any verification by the plaintiffs. On April 8, 1997, Fujimoto, Duane Owan, and Takamiya filed affidavits verifying the complaint as "true to the best of [their] knowledge, information and belief." Mitchell Owan and Hashimoto filed similar affidavits on April 14, 1997. McDonald filed his affidavit on April 21, 1997.

On April 14, 1997, the Sutherlands and Skys filed a motion to dismiss the plaintiffs' claims against them or, in the alternative, for summary judgment in their favor and for sanctions pursuant to HRCP Rule 11, on the grounds that the derivative claims set forth in the complaint were noncompliant with HRCP Rule 23.1. On the same day, Au filed a joinder in the motion.

The circuit court heard the motion on April 30, 1997. *Sua sponte*, the court stated that the plaintiff's verifications were inadequate because they were not based on the affiants' personal knowledge. After further arguments, primarily concerning the time when the plaintiffs had acquired their interests in the partnerships relative to the time when the alleged wrongdoing had occurred, the circuit court granted the motion for failure to comply with HRCP Rule 23.1. In this regard, the circuit court orally ruled as follows:

> If you want to proceed derivatively, you have to read Rule 23(1)[sic] before you start filing things and you have to comply with it. I don't believe you looked at this rule before you filed that count because if you had, you would have put a verification on there, and so I am going to find Rule 11 was violated—not in good faith filing, and I am going to order attorneys fees to [the Sutherlands' and Au's counsel].
>
> . . .
>
> I am, basically, going on the failure to comply with the rules. As far as filing derivative action, [the plaintiff's counsel] just didn't comply with the procedural requirements in filing it and that was violation of Rule 11.

On June 19, 1997, the circuit court entered its written order, which stated in relevant part that "all of Plaintiffs' claims and allegations contained in Count 10 of Plaintiffs' [complaint] entitled 'Limited Partners' Derivative Action' are dismissed with prejudice and summary judgment is granted in favor of [the Sutherlands, the Skys,] and . . . Au concerning said claims[.]" The circuit court also ordered, pursuant to HRCP Rule 11, that the plaintiffs and Yanagida pay the Sutherlands', the Skys', and Au's attor-

---

**7.** Count Ten of the plaintiffs' complaint alleged in relevant part:

Limited Partners' Derivative Action
. . . .
110. [Fujimoto] did demand of defendant [Kim] a true and full report of the status of the [Kailua Estates].
111. [McDonald] did demand of [Weimer] and [Kim] a true and full report of the disposition of the funds made by plaintiffs.
112. These plaintiffs are shareholders of Kailua Estates . . . and Kailua Partners, re-

spectively, and fairly and adequately represent interests of shareholders or members similarly situated in enforcing the right of the limited partnerships.
113. No plaintiff at any time has received a true and full report on the status of the limited partnerships.
114. Neither partnership is able to enforce the rights of the limited partnership.
115. Plaintiffs allege each of the foregoing counts on behalf of the limited partnership as a derivative action against defendants.

neys' fees and costs in the total amount of $2,609.67.[8]

On January 9, 1998, the plaintiffs filed a motion for a protective order to "stay any proceedings in this case from February 23, 1998 to April 3, 1998," on the basis that a trial in another action, involving the same partnerships but a different group of plaintiffs, was scheduled to commence on March 2, 1998, and the plaintiffs' counsel was a solo practitioner. On January 13, 1998, Jorgensen noticed depositions of the seven plaintiffs in the present matter for February 10 through 13, 1998. The circuit court heard the motion for protective order on January 30, 1998. At the beginning of the hearing, the court stated, "As I understand there's no pending discovery. I mean, this is not aimed as a protective order with regard to any particular discovery." Yanagida replied:

That is not correct, your Honor. Subsequent to—on January 27th, we received from one defendant this discovery request in this case. We have also received a request for back to back depositions on February 10th, 11th, and 12th. We agreed, as I noted in my letter, to make the deponents available on one day and offered to reschedule in April after the conclusion of the trial[.]

If we are required to, we will move with separate motions. However, your Honor, we would submit this Court has enormous discretion over the control of its calendar.

The landowners' counsel opposed the plaintiffs' motion on the grounds that the motion invoked HRCP Rule 26, which allowed a party to seek protection against a pending discovery request, but counsel "didn't see any discovery that's been cited [in the plaintiffs' motion] that plaintiffs seek protection from." He also argued that a general stay of the proceedings was unwarranted.

Au's counsel pointed out that there was no discovery pending at the time the plaintiffs filed their motion for a protective order. He insisted that Jorgensen had been cooperative with the plaintiffs in scheduling their depositions outside the period as to which they sought a stay in the litigation. Au's counsel concluded his argument as follows:

There is no basis for the stay of the litigation. We have no intent to interfere with the trial. In fact, we're curious as to what will be the outcome of [Yanagida's] trial. But these depositions, I think, should go forward and it's not during the time period that she asked for a protective order. She asked starting from February 23.

Jorgensen's counsel argued as follows:

It's important for the Court to recognize that this attempt by Ms. Yanagida is uncalled for. There's no pressing discovery that's at issue with regard to her motion, and I believe that these type[s] of discovery disputes ought to be resolved between the attorneys and we ought not to be bothering the attorneys [sic] with matters that the defense and plaintiffs['] attorney[s] could take care of themselves.

He further argued that the alternative deposition dates offered by the plaintiffs were unacceptable to Jorgensen, in light of the existing discovery and motions cutoff dates and in spite of the plaintiffs' offer to extend the discovery period. He emphasized Jorgensen's prior efforts to resolve the discovery disputes with the plaintiffs informally and concluded as follows: "Now, again, it has

8. The plaintiffs' counsel, Joy Yanagida, appealed the sanctions order against her in No. 20857; this court summarily affirmed the circuit court's decision on August 27, 1998. Yanagida did not move for reconsideration. We note that her notice of appeal in No. 20857 did not reflect that the appeal of the circuit court's June 19, 1997 order was limited to the sanctions levied against her. Nevertheless, the only aspect of that order over which this court had appellate jurisdiction was precisely the levying of sanctions against Yanagida, pursuant to the collateral order doctrine. See Siangco v. Kasadate, 77 Hawai'i 157, 161, 883 P.2d 78, 82 (1994) (holding that orders

imposing sanctions against attorneys are immediately appealable under collateral order doctrine, on the ground that, if required to await final judgment in the case, attorney's right to appeal sanction order would be irretrievably lost if parties decided to settle or not appeal). Thus, this court's August 27, 1998 summary disposition order had no effect on the non-appealable portions of the circuit court's order, including the dismissal with prejudice of the plaintiffs' derivative action claims in count ten of their complaint, the summary judgments in favor of the landowners and Au, and the levying of sanctions against the plaintiffs.

to be noted for the record that those particular depositions are scheduled at a time which are [sic] not the subject of this particular motion."

Kim's counsel stated that she hoped that the depositions would go forward as planned, although she believed that certain adjustments to the deposition schedule were desirable and should be agreed upon among counsel. She urged the circuit court to deny the motion, stating, "I feel I'm being prejudiced. It says, to me, I can't do anything in the case, albeit in six months [sic], and I can't do anything about the claims."

> Ultimately, the following colloquy ensued:
>
> THE COURT: You filed three separate lawsuits. Litigated three separately, pretty vigorously, involving a lot of attorneys, a lot of parties, and now they're all coming up for trial and the people you've sued are trying to get ready for trial and you want the clerk to call a discretionary time out.
>
> MS. YANAGIDA: Your Honor, you have exercised the discretion to put us in the position of defending eight pleadings—
>
> THE COURT: Oh, it's my fault. It's my fault. Is that what you're saying?
>
> MS. YANAGIDA: You control the calendar, your Honor.
>
> THE COURT: Okay.

MS. YANAGIDA: You waive motions—

THE COURT: I don't see a basis for a general stay which you've requested, and I am going to deny the motion.

On February 17, 1998, the plaintiffs filed a motion for recusal of the circuit court judge on the basis that some of the defendants in the present matter had made substantial payments to and had received payments from the accounts of the judge's former law firm in connection with and during the period of the fraudulent activity alleged in the plaintiffs' complaint. On the same day, Au filed a motion for default judgment and sanctions against the plaintiffs. Au alleged that the plaintiffs and Yanagida had violated the circuit court's order denying the motion for a protective order by refusing to attend their scheduled depositions on February 10 through 13, 1998. He requested sanctions pursuant to HRCP Rule 37 (2000),[9] including dismissal or default judgment against the plaintiffs, together with attorneys' fees and costs. Jorgensen and Kim joined in Au's motion on February 20 and March 6, 1998, respectively.

Correspondence between counsel, which was attached to Au's and Jorgensen's moving papers, reflects that Yanagida had attempted to schedule the plaintiffs' depositions to take place between December 15, 1997 and De-

---

**9.** HRCP Rule 37 provides in relevant part:

**FAILURE TO MAKE DISCOVERY: SANCTIONS**

(b) **Failure to Comply With Order.**

. . . .

(2) Sanctions by Court in Which Action Is Pending. If a party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

. . . .

(d) **Failure of Party to Attend at Own Deposition or Serve Answers to Interrogatories or Respond to Request for Inspection.** If a party . . . fails (1) to appear before the officer who is to take his deposition, after being served with a proper notice . . . the court in which the action is pending on motion may make such orders in regard to the failure as are just, and among others it may take any action authorized under paragraphs (A), (B), and (C) of subdivision (b)(2) of this rule. In lieu of any order or in addition thereto, the court shall require the party failing to act or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

The failure to act described in this subdivision may not be excused on the ground that the discovery sought is objectionable unless the party failing to act has applied for a protective order as provided by Rule 26(c).

cember 19, 1997 or between March 24 and April 9, 1998. However, Jorgensen's counsel had rejected the December 1997 deposition dates because, until December 22, 1997, he had been dissatisfied with the completeness of the plaintiffs' answers to his interrogatories. He had also rejected the March 1998 and April 1998 deposition dates as being too close to the discovery cutoff in the present matter. In response to Jorgensen's January 13, 1998 notice of depositions to be taken on February 10, 1998 through February 13, 1998, Yanagida had stated that she would agree to a deposition on February 12, 1998, but that any further depositions would have to be conducted in April 1998 due to several trials scheduled for January and February 1998, as well as another trial involving the same partnerships but a different group of investors, which was scheduled to commence on March 2, 1998. Yanagida also suggested an extension of the discovery cutoff date in the event that Jorgensen were to agree to the stay that she had requested in her motion filed on January 13, 1998. Jorgensen's counsel rejected her offer and insisted that he would proceed with the plaintiffs' depositions as noticed. On February 6, 1998, Yanagida informed the other parties that it was necessary to reschedule the deposition to which she had agreed, as well as the depositions scheduled over her objections, due to various developments in several other lawsuits related to the present matter that required her attention. She offered March 24 and March 26, 1998 as alternative deposition dates. Jorgensen's counsel once again rejected Yanagida's attempt to reschedule the depositions.

The circuit court filed an order denying the plaintiffs' motion for a protective order on February 23, 1998. On February 24, 1998, the circuit court judge filed a certificate of recusal.

On March 27, 1998, Au's motion for default judgment and sanctions was heard by another circuit court judge. Au and Jorgensen argued that, by alluding to the scheduled depositions at the hearing on January 30, 1998, the plaintiffs had, in effect, extended the scope of their requested protective order to the depositions. The plaintiffs insisted that, as of the time of the January 30, 1998 hearing, they were not seeking to alter the deposition dates and that the general stay they had requested did not apply to the depositions. Indeed, the plaintiffs maintained that they had not anticipated that they would be unable to accommodate the defendants regarding the depositions. The circuit court ruled as follows:

THE COURT: Well, nevertheless, on the previous hearing there was a ruling—

MS. YANAGIDA: And the ruling did not apply.

THE COURT:—denying your motion, right? Denying your motion. And the motion did expand—or at least the purpose of the motion, as reflected in the court's comments, was for a—it appeared that you wanted a discretionary time—out, so to speak. I've got too many cases going at one time, I'm trying to balance them all together, and I just don't have time and I don't have the opportunity to sit around and give depositions with my clients on one case when I've got another case involving the same clients—

MS. YANAGIDA: That's not what we said, your Honor.

THE COURT:—on another case.

MS. YANAGIDA: That's not what we said.

THE COURT: Well, I don't know what you said. I know what the court said, and this is basically the whole brunt of that particular hearing, as I see it. It was you were in a problem. You put yourself in a situation where you had too many things going at once, and you wanted, and apparently insisted upon and followed up on, time to prepare for the other case; whereas the movants in this case, those who had argued at the previous hearing as well as those who had given notice to you of depositions and so forth for March, were seeking discovery on their case.

Now, the fact that you're busy on another case doesn't excuse you from paying attention to another case in which a Court makes a ruling telling you better get with it, Ms. Yanagida. You got too many things going on one time? Well, resolve them. Do something about it.

So I am—I mean, I think I can find without any problem that there is a basis for this motion. The only question I have is what's the appropriate sanction? So I am going to grant the motion to the extent that I will impose sanctions.

As regards the default judgment portion, I'm reluctant, because this is the attorney's decision, and I don't want to default the—her clients for her conduct, for her actions in contradiction to the Court's previous rulings, and so I will order again that the motion be granted in part as regards sanctions, and that those sanctions I will take under advisement[.]

On May 4, 1998, the circuit court entered a written order partially granting Au's motion and stating in relevant part:

1. That the Court finds that there is a basis for granting the motion on the grounds that Plaintiffs violated the Court's Order Denying Plaintiff's Motion for Protective Order by, *inter alia*, failing to appear at their properly noticed depositions;

2. That this Court is reluctant to grant default judgment against the Plaintiffs because it appears that it was not the Plaintiffs, but instead, it was Plaintiffs' counsel who committed the wrongful acts, and, therefore, the request for default judgment against the Plaintiffs is denied at this time;

3. That this Court grants the request for sanctions in favor of [Au], [Jorgensen], and [Kim], and against Plaintiffs, and the Court takes under advisement the amount of the sanctions and/or the type of the sanctions to issue against Plaintiffs.

On December 16, 1998, Jorgensen filed a motion to establish the amount and type of sanctions to be imposed pursuant to the circuit court's May 4, 1998 order. At a hearing conducted on December 29, 1998, the circuit court ruled:

As regards number 7 [Jorgensen's motion], we haven't heard argument on that, but I'm just going to order that affidavits of costs and fees be submitted to the Court for the costs involved in the motions that were involved with the sanctions as well as the preparations for the four times, I believe it was, that there were depositions planned and set. So you—I need to know

what the costs and fees were for those. I will then render a ruling—or an order as to the amount to be paid.

The amount will be assessed specifically to counsel for the Plaintiffs, not the Plaintiffs.

On February 24, 1999, the circuit court filed an order (1) requiring Yanagida to pay (a) Jorgensen's attorneys' fees and costs in the sum of $7,591.48 and (b) Au's attorney's fees and costs in the sum of $3,698.30 and (2) stating that "[t]his order is based on Rule 11, [HRCP]."

Meanwhile, on June 10, 1998, Au and Jorgensen filed motions for summary judgment with respect to all of Fujimoto's claims on the ground that Fujimoto lacked standing to maintain the present lawsuit, inasmuch as he was not the party who actually invested in the partnerships. On the same day, Au filed a joinder in Jorgensen's motion. Hewitt joined in their motions on June 12, 1998.

The circumstances surrounding Fujimoto's investment in Kailua Estates are described in a declaration, filed on April 14, 1997, in which Fujimoto stated that he was part owner of a company, denominated J & J Auto Repair, which he had started in 1957. He decided to invest in the partnerships after Kim, whom he had known through social contacts, had represented to him that he could expect a $42,000.00 return on a $25,000.00 investment in two years. He directed his daughter, who was then operating the auto repair shop, to issue a check in the amount of $25,000.00 to Kailua Estates. The money represented his savings, which he had intended to use for his retirement. The relevant portion of Fujimoto's declaration stated:

11. The $25,000 was a big part of my savings. I was hoping to be retired by this time of my life. But my retirement is based mostly on money that I saved myself, year after year. The business did not have a retirement plan for me. And the closing of the sugar business has hurt all of us small business owners. I still work every day at the shop.

12. My daughter now runs the business. In the recession, the business could

really use the $25,000. She is really upset about the loss.

In addition, Fujimoto's declaration recited that he had signed the Kailua Estates subscription agreement in his own name, providing his personal social security number, residence and business addresses, and telephone numbers, and identifying himself as "retired director" of J & J Auto Repair. He specified the "manner of purchase desired" as "Other Type [—] Title Under J & J Auto Repair Inc." The Internal Revenue Service (IRS) Schedule K-1 (Partner's Share of Income, Credits, Deductions, Etc.) that Kailua Estates issued to Fujimoto for the tax year 1991 described Fujimoto as an "individual" partner. During his depositions, conducted on May 19 and 29, 1998, Fujimoto explained:

Q Where did the $25,000 come from? I understand it came from J & J Auto Repair, Inc.'s checking account—

A Yeah, part of my retirement in the company.

Q But it came from a, written on a check from J & J—

A Right—

Q —Auto Repair?

A —I own J & J. I am J & J.

Au and Jorgensen based their motions for summary judgment on the following excerpts from Fujimoto's depositions:

Q Who invested in Kailua Estates Partners, you or J & J?

A J & J.

. . . .

Q Who are the shareholders in J & J?

A My family.

Q Could you be more specific? Names?

A My wife.

Q What is your wife's name?

A Lilian.

Q Okay. Who else is a shareholder in J & J?

A Joanne.

Q And who is Joanne?

A Shiroma, my daughter.

Q Okay, anybody else?

A Laura Fujimoto.

Q And yourself?

A Right.

. . . .

Q How much stock in J & J do you own presently?

A I'm not sure. Because when I retired I told my daughter, you guys take over the company and you guys take the majority of the stock, I just want a little bit for me and my wife.

But I don't know whether she did it or she didn't do it or what, I'm not sure.

. . . .

Q Did you have any expectations of getting your money back or—was that J & J money or was that your money?

A J & J.

. . . .

Q Mr. Fujimoto, did you James Fujimoto invest in Kailua Partners?

A James Fujimoto didn't, but J & J did, and I am J & J.

Q Did you James Fujimoto invest in Kailua Estates Partners?

A Kailua Estates Partners?

Q Yes.

A Under J & J.

Q You're saying you invested in both partnerships?

A No, in KEP.

Q Okay. Not James Fujimoto but J & J.

A J & J Auto, which is James Fujimoto.

Q If you recover any money from this litigation, where will that money go? Will it go back to J & J?

A Yes.

Q Why isn't J & J suing?

A Because they put up the money.

Q But why aren't they the plaintiff? You're not the plaintiff. You didn't invest.

A But I'm representing J & J.

Q In what capacity?

A I'm the owner.

Q In what capacity? How are you the owner?

. . . .

Q Is it your understanding that you James Fujimoto and the corporation are interchangeable and the same?

. . . .

Q Is that your understanding?

A My understanding is J & J is my company and I can do whatever is fit for me to do, whether it's under my name or J & J.

Au and Jorgensen asserted in their memoranda in support of their motions for summary judgment that, based on the foregoing deposition testimony, it was "undisputed" that Fujimoto neither invested in Kailua Estates nor intended to be a limited partner, but, rather, that J & J Auto Repair was the intended investor/limited partner. Fujimoto did not directly deny these assertions in his memorandum in opposition, but, rather, argued that he was the "real party in interest" in the lawsuit, within the meaning of HRCP Rule 17(a), *see supra* note 3, and, in any event, that HRCP Rule 17(a) precluded a dismissal of his claims. Specifically, he argued that he was the "real party in interest" because he had signed the partnership agreement in his individual capacity. He conceded, however, that he had intended to buy the shares on behalf of J & J Auto Repair. He asserted that the source of the invested funds was irrelevant and that, inasmuch as a certificate of limited partnership—naming J & J Auto Repair as a limited partner pursuant to HRS § 425D–201 (1993) [10]—had never been filed, J & J Auto Repair could not have legitimately initiated, lacking standing, the present action in its own name in any event.

The circuit court heard the motions on June 29, 1998. The following colloquy transpired during the proceeding:

THE COURT: Who invested the money?

MS. YANAGIDA [ (Fujimoto's counsel) ]: He [ (Fujimoto) ] invested the money and he used J & J's money. The check says J & J Auto.

THE COURT: That didn't answer the question. Who invested the money?

MS. YANAGIDA: The person?

THE COURT: Whose money is it?

MS. YANAGIDA: The owner of the money is J & J Auto.

THE COURT: Okay. Doesn't that kind of simplify the whole thing?

MS. YANAGIDA: Certainly J & J would be prepared to ratify if you deem that. J & J is not the entity in whose name the contract was brought.

THE COURT: But all of the evidence, at least as you look at the depositions, reflects that it was the entity that was involved and it was the entity that was claiming standing. It was the entity that was claiming the loss.

MS. YANAGIDA: That's James Fujimoto's position, and what the partners said when they issued the K–1 [tax form] is that it's James Fujimoto as an individual.

If the Court believes that the weight of the evidence is that it's J & J Auto's interest, then under Rule 17, J & J should be given a timely opportunity to ratify, which for sure James Fujimoto's company is going to do.

The circuit court ruled as follows:

. . . I am going to find real simply that based on the depositions of the—of the plaintiff, Mr. Fujimoto, as well as the documents that have been submitted, that it's clear to this Court that from the beginning this lawsuit should have and [was] required

10. HRS § 425D–201 (1993) provided:

**Certificate of limited partnership.** (a) In order to form a limited partnership, a certificate of limited partnership must be executed and delivered to the office of the director [of commerce and consumer affairs] for filing. The certificate shall set forth:

(1) The name of the limited partnership;

(2) The address of the principal office;

(3) The name and the residence address of each general partner;

(4) The name and address of each limited partner;

(5) The latest date upon which the limited partnership is to dissolve; and

(6) Any other matter the general partners determine to include therein.

(b) A limited partnership is formed at the time of the filing of the certificate of limited partnership in the office of the director if there has been substantial compliance with the requirements of this section.

In 2000, HRS § 425D–201 was amended in respects not affecting our analysis. *See* 2000 Haw. Sess. L. Act 219, § 61 at 566–67.

to have been filed in the name of J & J Auto and not Mr. Fujimoto. He is not the real party in interest; therefore, he does not have standing to proceed with this lawsuit.

It seems to me that this is not—this is more than just an understandable mistake that has been made. It's fairly clear that Mr. Fujimoto's intent and position was that this was an investment by J & J Auto and not by himself personally.

That being the case, the question is, I guess, whether or not there should be any further permission under 17(a) to proceed, and although this Court is inclined to be lenient when an honest mistake has been made, in choosing the party in interest I'm not convinced that it was—falls under that category. And so this Court's going to find that this is—this is not an understandable, honest mistake, and will not allow any further substitution of parties in accordance with the argument of plaintiff.

On July 23, 1998, the circuit court entered a written "Order Granting Defendant Richard Jorgensen's Motion For Summary Judgment Regarding All Of The Claims Of Plaintiff James Fujimoto Filed June 10, 1998," in which it found that "Fujimoto ha[d] no standing to proceed with the lawsuit" and that "the naming of Plaintiff Fujimoto was not an understandable, honest mistake"; accordingly, the circuit court denied J & J Auto Repair the opportunity either to ratify Fujimoto's acts or to move to substitute itself for Fujimoto as a party plaintiff, pursuant to HRCP Rule 17(a).

On October 23, 1998, Jorgensen and Hewitt filed motions for summary judgment against all of the plaintiffs with respect to all counts of their complaint.[11] Au joined in both motions three days later. On November 18, 1998, Au filed a motion for summary judgment with respect to Counts One, Four, Five, Six, and Nine and a second motion for summary judgment with respect to Counts Two, Three, Seven, and Eight, effectively moving for summary judgment on all counts.

For purposes of summary judgment, Hewitt admitted that he had been a general partner of Kailua Estates, denied any involvement in Kailua Partners, and asserted that he had not communicated in any way with the plaintiffs prior to the commencement of the present lawsuit. Regarding his involvement in Kailua Estates, Hewitt averred that: (1) he had left the responsibility for conducting the partnership's affairs in Weimer's hands; (2) he had not been actively involved in the solicitation of investments for the partnership; (3) he had never seen any financial statements, bank account statements, or tax returns of the partnership; (4) he had no knowledge of any unauthorized payments out of the partnership's funds; (5) with two exceptions, he had not participated in business discussions regarding the affairs of the partnership; and (6) he had never received any compensation from the partnership.

Also for purposes of summary judgment, Au averred that: (1) he signed the partnership agreement of Kailua Partners without having read it and premised upon the understanding that he would have no liability and that Weimer would be responsible for managing the partnership; (2) he was not acquainted with any of the plaintiffs except through the present lawsuit; and (3) he had not sold or solicited any of the shares of Kailua Partners. He also averred that, on or about October 18, 1991, he had loaned $25,000.00 to Kailua Partners, which had been repaid in full. Au attached a copy of a handwritten document, dated October 18, 1991, as an exhibit to his motion, which stated: "To whom it may concern, Received this date from Gordon S.K. Au the sum of $25,000 as a loan to Kailua Partners. This amount plus $5,000 from William G. Weimer to be repaid no later than October 30, 1991." Attached as an exhibit to Au's motion was also a "Promissory Note," dated December 27, 1991, by which Weimer, individually and on behalf of Kailua Partners, acknowledged indebtedness to Au in the amount of $31,000.00; the note stated that "[t]his Promissory Note is an extension of the Promissory

11. Inasmuch as we do not have jurisdiction over the plaintiffs' appeal of the circuit court's order granting Jorgensen's motion for summary judgment, *see supra* at 7, we do not address the substance of his motion.

Note dated October 18, 1991" and recited January 30, 1992 as the maturity date.

The plaintiffs, by way of a single memorandum in opposition, opposed Au's, Hewitt's, and Jorgensen's motions for summary judgment, alleging that there were genuine issues of material fact to be resolved and that the movants were not entitled to judgment in their favor as a matter of law. As exhibits to their memorandum, they attached copies of signature pages of several Kailua Partners subscription agreements accepted by Au as a general partner. They also attached a letter from Au to Kim, dated December 2, 1991, (1) regarding the deposit of (a) new Kailua Partners investors' funds and referring to "enclosed" one-half shares of Lynn K. Funakoshi and Rachel K. Haili, together with their accompanying checks, and (b) funds into Au's account, referring to enclosed "deposit slips" and insisting that only certified checks or cash be deposited, and (2) expressing concern over financial controls and, particularly, payments between Weimer and the Sutherlands. Specifically, Au stated in the letter that "I can't believe that Weimer would actually make partial payments on the land purchase without closing the escrow. Something is awfully wrong because it jeopardizes or binds the investors who are already in, perhaps? ? ?"

As an additional exhibit, the plaintiffs attached a note from "B.J." [i.e., Kim] to "Gordon" [i.e., Au], dated January 30, 1992, stating:

If you refuse to sell the limited partners shares and Bill [ (Weimer) ] can't sell and I refuse to sell, then how on earth can you get your money back from Bill? Months ago I told you that I would try to sell some shares. Enclosed is a flyer from me to people. I promise never to use your name any more. So far no one has called me for appointment so you don't have to worry about anything. All I am doing is to make a few sales of the limited partners so that you can get paid from Bill.

Moreover, the plaintiffs attached the declaration of Kent K. Tsukamoto, CPA, of PricewaterhouseCoopers, LLP, which addressed the financial condition of Kailua Estates and Kailua Partners. In his declaration, and based on the resumes of the general partners as set forth in the memoranda of private offering circulated to the prospective investors, Tsukamoto opined that none of the general partners, with the possible exception of Au, appeared to be qualified to keep and maintain books of account for the partnerships, and, accordingly, properly to monitor and control the project. Tsukamoto further opined that the general partners should have hired a bookkeeper and an accountant to maintain the books and to monitor the financial status of the development. He determined that, if basic procedures had been followed, the misdirection of investors' funds would have been apparent from the monthly report for January 1991, when the first investor made a deposit, and the misdirection would have been "undisputable" by the time the April 1991 report had been disseminated. He noted that the absence of a certificate of limited partnership, issued by the State of Hawai'i Department of Commerce and Consumer Affairs (DCCA), would have precluded an accounting firm, such as PricewaterhouseCoopers, from maintaining the partnerships' books of account. Tsukamoto determined that, from the $50,000.00 invested by Takamiya on February 3, 1992, $25,005.00 was immediately transferred to Au and $17,000.00 to Kim. Tsukamoto's declaration and attached "findings and professional opinion" addressed numerous discrepancies in the partnerships' financial records, as well as several additional payments that were not adequately documented and appeared to be improper.

The plaintiffs also attached the declaration of Karen Arakawa, a vice-president of Island Title Corporation (Island Title), to their memorandum in opposition. Island Title was the escrow holder in connection with the purchase of the land to be developed by the partnerships. *Id.* Arakawa averred that, without a copy of the certificate of limited partnership from the DCCA confirming that Kailua Partners was a legal entity, the sale of the land could not have closed. A preliminary report prepared by Island Title and attached to Arakawa's declaration reflected (1) a mortgage on the land, dated November 6, 1989, securing the repayment of

$180,000.00 by the Skys to GECC Financial Corporation ("GECC") and (2) an assumption agreement dated April 3, 1990. A "Deposit Receipt Offer and Acceptance" form ("DROA"), likewise attached to Arakawa's declaration, reflected that, on June 28, 1991, Kailua Partners had entered into an agreement with the Sutherlands and the Skys to acquire the land for the price of $1,000,000.00, establishing an escrow account to accomplish that purpose.

Exhibits attached to Arakawa's deposition, which were, in turn, attached as exhibits to the plaintiffs' memorandum in opposition, reflect that, by April 1992, the landowners had cancelled the Island Title escrow. A handwritten memorandum to Island Title, dated November 17, 1991 but apparently not executed until 1992, recites that "buyer has not performed terms of contract agreement." A summary of the escrow account, dated January 3, 1992, also reflected payments of (1) $100,000.00 to GECC on July 12, 1991, (2) $8,333.33 to GECC on October 4, 1991, (3) $8,333.33 to Pesce on October 4, 1991, and (4) $8,333.33 to the Sutherlands on January 3, 1992.

Finally, the plaintiffs attached a copy of a "preliminary order to cease and desist" to their memorandum in opposition, which had been issued by the DCCA on November 9, 1998 and which found that the partnerships, Weimer, and Kim had "engaged in acts, practices and/or a course of business which operates as fraud or deceit upon persons," citing specific instances of acts and omissions, including: (1) distribution of materials referring to limited partnerships, when no limited partnerships were registered; (2) representations that the monies collected from the investors would be used to purchase and/or develop land, when nearly all of the monies went to Weimer and Kim; (3) failure to meet the terms of the land purchase agreement and the ultimate cancellation of the agreement and escrow; and (4) failure to include the return of capital contribution and the cost of financing of the purchase price of the property in the projected profit analysis.[12]

The circuit court heard Jorgensen's, Hewitt's, and Au's motions for summary judgment on December 29, 1998. The court orally granted the motions, stating that

the actions of the Defendants in this case, Jorgensen, Hewitt especially, who were not part of [Kailua Partners], and Au who was a part of [Kailua Partners] as a general partner, but who nevertheless the Court is going to include in these rulings similarly, reflect—their actions reflect little or no involvement in any kind of the allegations that have been submitted in the complaint.

The Plaintiff [sic] has not submitted evidence to defeat their substantial grounds, factual as well as legal, for granting of the motions for summary judgment.

On January 11, 1999, Au filed a motion for attorneys' fees and costs, claiming attorneys' fees of "at least" $106,291.00 and costs of "at least" 19,858.26; because of the anticipated award of sanctions that he had already requested against the plaintiffs and Yanagida, however, he reduced the total sum sought to $114,421.93. On January 14, 1999, Jorgensen filed a motion for attorneys' fees and costs, claiming $80,584.82 in attorneys' fees and $15,146.12 in costs, which likewise represented sums discounted by the amounts of the requested sanctions. On the same day, Hewitt filed a motion for attorneys' fees and costs, seeking an award of $12,863.27, which consisted of $11,463.27 in attorneys' fees and costs already incurred and an additional $1,400.00 in anticipated fees and costs.

12. In its final orders, issued on December 15, 1998 and February 12, 1999, *see supra* note 6, the DCCA reaffirmed all of its findings set out in the preliminary order. On July 7, 1999, the circuit court entered an order (1) granting the plaintiffs' motion for adoption and confirmation of all of the DCCA's findings in its preliminary cease and desist order, dated November 9, 1998, as well as its final orders dated December 15, 1998 and February 12, 1999, (2) adopting the DCCA's orders insofar as they awarded restitution to each of the plaintiffs, (3) granting summary judgment in favor of the plaintiffs and against Kailua Partners, Weimer, and Kim on all counts (except for Count Ten), (4) granting judgment in favor of the plaintiffs and against Kailua Partners, Weimer, and Kim, jointly and severally, in the amount of $426,647.00, plus interest, and (5) directing entry of final judgment pursuant to HRCP Rule 54(b). Final judgment was entered on the same day.

On January 19, 1999, the circuit court entered written orders granting Au's, Hewitt's, and Jorgensen's motions for summary judgment against the plaintiffs as to all counts. *Id.* at 7574-85. The circuit court heard the motions for attorneys' fees and costs on February 24, 1999. On February 25, 1999, the circuit court filed an order awarding (1) Au $34,681.57 in attorneys' fees and $ 7,833.53 in costs, (2) Hewitt $9,642.61 in attorneys' fees and $1,820.66 in costs, and (3) Jorgensen $24,425.46 in attorneys' fees and $9,884.59 in costs, all to be paid by the plaintiffs jointly and severally.

On the same day, February 25, 1999, the circuit court entered yet another order granting Hewitt's and Jorgensen's motions for summary judgment as to all counts and Au's motion for summary judgment as to Counts One, Four, Five, Six, and Nine. In addition, the circuit court entered an order certifying as final judgments, pursuant to HRCP Rule 54(b) (1996),[13] (1) the February 25, 1999 orders relating to attorneys' fees and costs, (2) the February 25, 1999 summary judgment orders, (3) the July 23, 1998 orders granting Au's and Jorgensen's motions for summary judgment with respect to Fujimoto's claims, (4) the February 24, 1999 order sanctioning Yanagida to pay Au's and Jorgensen's attorneys' fees and costs, and (5) the June 19, 1997 order dismissing the plaintiff's derivative claims against the Sutherlands and the Skys with prejudice.

On March 25, 1999, Yanagida filed a notice of appeal from the orders entered by the circuit court on February 25, 1999. However, Yanagida mistakenly named herself as the appellant, and the appeal was premature. On the same day, Yanagida filed a notice of appeal from the circuit court's February 24, 1999 sanctions order against her. Yanagida's appeal of the sanctions order was timely.[14]

On April 19, 1999, the circuit court entered an order amending its February 25, 1999 order that certified its prior orders as final judgments in favor of Au, Jorgensen, and Hewitt by certifying, pursuant to HRCP Rule 54(b), the January 19, 1999 order granting Au's motion for summary judgment on counts two, three, seven and eight as a final judgment. On the same day, the circuit court entered a final judgment, certified pursuant to HRCP Rule 54(b), in favor of Au and against all the plaintiffs (1) on all of the plaintiffs' claims and (2) in the sum of $42,515.10, jointly and severally. Lastly, the circuit court entered a final judgment, certified pursuant to HRCP Rule 54(b), in favor of Hewitt and against all the plaintiffs (1) on all of the plaintiffs' claims and (2) in the sum of $11,463.27, jointly and severally.[15]

■■■ On April 20, 1999, the circuit court entered a final judgment in favor of Jorgensen and against Yanagida in the total sum of $7,591.48. On the same day, the circuit court filed a document, entitled "final judgment in favor of defendant Richard Jorgensen and against [the plaintiffs]," stating in relevant part:

> NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that an award of attorneys' fee ... and an award of costs ... are proper and reasonable ... to be paid by [the plaintiffs], jointly and severally, to [Jorgensen]. Further, there being no just reason for delaying entry of final judgment pursuant to [HRCP] Rule 54(b), final judgment be and hereby is entered in favor of [Jorgensen] and against [the plaintiffs], jointly and severally, for attorneys' fees in the amount of $24,425.46 and costs in the amount of $9,884.59.
>
> NOW, THEREFORE, IT IS HEREBY FURTHER ORDERED, ADJUDGED

---

13. HRCP Rule 54(b) provides in relevant part:
 When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

14. The sanctions order was appealable pursuant to the collateral order doctrine, *see supra* note 8.

15. The plaintiffs state in their opening brief that Hewitt settled his claims with them on April 9, 1999. Opening Brief at 1. However, the record does not reflect any settlement. Hewitt did not file an answering brief in this appeal.

AND DECREED Defendant Richard Jorgensen, pursuant to HRCP Rule 54(b), ... is entitled to certification of (1) [the July 23, 1998 order granting summary judgment in favor of Jorgensen and against Fujimoto with respect to all of the latter's claims], (2) [the October 23, 1998 order granting Jorgensen summary judgment on all counts], (3) [the February 25, 1999 order awarding Au, Hewitt, and Jorgensen attorneys' fees and costs], and (4) [the February 24, 1999 sanctions order awarding Au and Jorgensen attorneys' fees and costs].

Thus, the circuit court entered a final judgment in favor of Jorgensen as to attorneys' fees and costs, but did not enter a final judgment resolving the plaintiff's substantive claims against Jorgensen.[16]

On May 10, 1999, the plaintiffs filed an "amended notice of appeal" from (1) the April 19, 1999 certified judgments in favor of Au and Hewitt, (2) the April 20, 1999 certified "judgment" in favor of Jorgensen, (3) the February 25, 1999 summary judgment orders in favor of Au, Hewitt, and Jorgensen, and (4) the February 25, 1999 order awarding Au, Hewitt, and Jorgensen attorneys' fees and costs.

On May 17, 1999, Jorgensen filed a notice of cross-appeal from (1) the February 25, 1999 attorneys' fees and costs order and (2) the April 20, 1999 certified "judgment" in favor of Jorgensen.

On May 19, 1999, Yanagida filed an "amended notice of appeal" from the February 24, 1999 sanctions order, and "insofar as they apply to Yanagida," from: (1) the April 19, 1999 amended order certifying the prior orders of the circuit court as final judgments; (2) the April 19, 1999 certified judgment in favor of Au and against the plaintiffs; and (3) the April 20, 1999 certified judgment in favor of Jorgensen and against Yanagida.

## II. STANDARDS OF REVIEW

### A. Motion For Summary Judgment

We review [a] circuit court's award of summary judgment de novo under the same standard applied by the circuit court. Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 104, 839 P.2d 10, 22, reconsideration denied, 74 Haw. 650, 843 P.2d 144 (1992) (citation omitted). As we have often articulated:

[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Id. (citations and internal quotation marks omitted); see [HRCP] Rule 56(c) (1990). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." Hulsman v. Hemmeter Dev. Corp., 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted).

---

**16.** We note that the circuit court's order awarding attorneys' fees and costs may not be certified as a final judgment, pursuant to HRCP Rule 54(b), because such an order is not a final decision with respect to a "claim for relief." See Elliot Megdal and Associates v. Daio USA Corp., 87 Hawai'i 129, 133, 952 P.2d 886, 890 (App. 1998) ("Rule 54(b) is designed to permit an immediate appeal from an otherwise final decision in a multi-claim or multi-party action.... Under this rule, the power of a lower court to enter a certification of finality is limited to only those cases where (1) more than one claim for relief is presented or multiple parties (at least three) are involved, ... and (2) the judgment entered completely disposes of at least one claim or all of the claims by or against at least one party.") See also 10 Wright, Miller & Kane, Federal Practice and Procedure Civil 2d § 2658.4, at 91–92 (commenting that Federal Rules of Civil Procedure Rule 54(b), which is identical to HRCP Rule 54(b), "refers only to claims in the sense of the substantive right being asserted—the cause of action—rather than requests that are incidental to the procedure for obtaining a judicial award") (footnote omitted). However, we may review the circuit court's orders awarding attorneys' fees and costs in favor of or against a party in the course of the appellate review of a final judgment certified pursuant to HRCP Rule 54(b), insofar as those orders relate to the final judgment and are being appealed. See, e.g., Honolulu Federal Sav. and Loan Ass'n v. Murphy, 7 Haw.App. 196, 753 P.2d 807 (1988) (vacating the order awarding attorneys' fees, costs, and expenses incident to vacating the summary judgment certified for appellate review under HRCP Rule 54(b)).

*Konno v. County of Hawai'i*, 85 Hawai'i 61, 70, 937 P.2d 397, 406 (1997) (quoting *Dunlea v. Dappen*, 83 Hawai'i 28, 36, 924 P.2d 196, 204 (1996)) (brackets in original). "The evidence must be viewed in the light most favorable to the non-moving party." *State ex rel. Bronster v. Yoshina*, 84 Hawai'i 179, 186, 932 P.2d 316, 323 (1997) (citing *Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995)). In other words, "we must view all of the evidence and the inferences drawn therefrom in the light most favorable to [the party opposing the motion]." *Maguire*, 79 Hawai'i at 112, 899 P.2d at 395 (citation omitted).

*Taylor v. Government Employees Ins. Co.*, 90 Hawai'i 302, 305, 978 P.2d 740, 743 (1999) (quoting *State Farm Mut. Auto. Ins. Co. v. Murata*, 88 Hawai'i 284, 287–88, 965 P.2d 1284, 1287–88 (1998) (quoting *Estate of Doe v. Paul Revere Ins. Group*, 86 Hawai'i 262, 269–70, 948 P.2d 1103, 1110–11 (1997))) (brackets in original).

### B. *Conclusions Of Law*

We review the trial court's [conclusions of law] *de novo* under the right/wrong standard. *Raines v. State*, 79 Hawai'i 219, 222, 900 P.2d 1286, 1289 (1995). "Under this ... standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Miller*, 4 Haw.App. 603, 606, 671 P.2d 1037, 1040 (1983). *See also Amfac* ..., 74 Haw. [at] 119, 839 P.2d [at] 28.... Thus, a [conclusion of law] "is not binding upon the appellate court and is freely reviewable for its correctness." *State v. Bowe*, 77 Hawai'i 51, 53, 881 P.2d 538, 540 (1994) (citation omitted).

*Pelosi v. Wailea Ranch Estates*, 91 Hawai'i 478, 487, 985 P.2d 1045, 1054 (1999) (citations omitted) (ellipsis points in original).

### C. *Attorneys' Fees And Costs*

██ "This court 'review[s] the ... denial and granting of attorney's fees under the abuse of discretion standard.'" *Eastman v. McGowan*, 86 Hawai'i 21, 27, 946 P.2d 1317, 1323 (1997) (quoting *Weinberg v. Mauch*, 78 Hawai'i 40, 52–53, 890 P.2d 277, 289–90, *reconsideration denied*, 78 Hawai'i 421, 895 P.2d 172 (1995)). *See also Coll v. McCarthy*, 72 Haw. 20, 28, 804 P.2d 881, 887 (1991). The same standard applies to this court's review of the amount of a trial court's award of attorney's fees. *See First Hawaiian Bank v. Smith*, 52 Haw. 591, 592, 483 P.2d 185, 186 (1971); *Sharp v. Hui Wahine, Inc.*, 49 Haw. 241, 244, 413 P.2d 242, 245, *reh'g denied*, 49 Haw. 257, 414 P.2d 82 (1966); *Powers v. Shaw*, 1 Haw.App. 374, 377, 619 P.2d 1098, 1101 (1980). "An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or has disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Davia*, 87 Hawai'i 249, 253, 953 P.2d 1347, 1351 (1998) (internal quotation signals and citations omitted).

*Piedvache v. Knabusch*, 88 Hawai'i 115, 118, 962 P.2d 374, 377 (1998). "Generally, taxation of costs is within the discretion of the trial court and will not be disturbed absent an abuse of discretion." *Canalez v. Bob's Appliance Service Center, Inc.*, 89 Hawai'i 292, 300, 972 P.2d 295, 303 (1999) (quoting *Eastman*, 86 Hawai'i at 27, 946 P.2d at 1323).

### D. *Imposition Of Sanctions For Discovery And Litigation Related Abuses*

██ "This court reviews the circuit court's imposition of sanctions for discovery abuse ... under the abuse of discretion standard." *Stender v. Vincent*, 92 Hawai'i 355, 362, 992 P.2d 50, 57 (2000) (citing *Kawamata Farms, Inc. v. United Agri Prods.*, 86 Hawai'i 214, 241, 948 P.2d 1055, 1082 (1997)). "All aspects of a HRCP Rule 11 determination should be reviewed under the abuse of discretion standard." *Canalez*, 89 Hawai'i at 300, 972 P.2d at 303 (quoting *Lepere v. United Public Workers*, 77 Hawai'i 471, 473, 887 P.2d 1029, 1031 (1995)).

## III. *DISCUSSION*

### A. The Circuit Court Erred In Granting Au's And Jorgensen's Motions For Summary Judgment Against Fujimoto On The Ground Of Lack Of Standing.

As we have indicated, the circuit court granted summary judgment in favor of Au

and Jorgensen and against Fujimoto on the ground that Fujimoto lacked standing to pursue the present action. Au and Jorgensen based their motion on Fujimoto's deposition, in which he stated that it was J & J that invested in Kailua Estates and that the funds invested were J & J's. However, at the same time, Fujimoto also insisted that he "was" J & J and that the invested funds were intended for his retirement. He testified that he did not perceive any difference between his investing as an individual and J & J's investing as a corporation. It is undisputed that Fujimoto signed the partnership agreement in his own name, rather than on behalf of J & J, but he also requested that "title" be "under J & J." A tax form issued to him by the general partners referred to him as an "individual" partner, but, during the hearing on the motions for summary judgment, Jorgensen's attorney represented that Fujimoto had admitted in his deposition that the tax form should have been included in J & J's tax return rather than his personal tax return.[17]

Thus, the evidence adduced by the parties appears to have created a genuine issue of material fact as to the precise identity of the entity that had invested when Fujimoto signed the partnership agreement and tendered a check drawn on J & J's bank account. Fujimoto's counsel appears to have conceded during the hearing on the motions that the invested funds belonged to J & J and that Fujimoto intended the investment to benefit J & J; nevertheless, counsel took the position that, because Fujimoto executed the limited partnership agreement in his individual capacity and was treated by the general partners as an individual investor, the lawsuit was appropriately filed in Fujimoto's name.

The circuit court agreed with Au and Jorgensen that Fujimoto lacked standing. However, Jorgensen, Au, and the circuit court have all mistakenly characterized the issue as one of standing.

"It is well settled that the crucial inquiry with regard to standing is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his or her invocation of the court's jurisdiction and to justify exercise of the court's remedial powers on his or her behalf." *In re Application of Matson Navigation Co. v. Federal Deposit Ins. Corp.,* 81 Hawai'i 270, 275, 916 P.2d 680, 685 (1996). In deciding whether the plaintiff has the requisite interest in the outcome of the litigation, we employ a three-part test: (1) has the plaintiff suffered an actual or threatened injury as a result of the defendant's wrongful conduct; (2) is the injury fairly traceable to the defendant's actions; and (3) would a favorable decision likely provide relief for plaintiff's injury. *Bush v. Watson,* 81 Hawai'i 474, 479, 918 P.2d 1130, 1135 (1996).

*Akinaka v. Disciplinary Bd. of Hawai'i Supreme Court,* 91 Hawai'i 51, 55, 979 P.2d 1077, 1081 (1999). This formulation of the standing requirement delineates the jurisdictional limits of a court's ability to decide a case. *Id.* On the other hand, we have acknowledged that a party's standing to litigate a case may be subject to "prudential rules" of judicial self-governance, as well as "legislative and constitutional declarations of policy." *Citizens for Protection of North Kohala Coastline v. County of Hawai'i,* 91 Hawai'i 94, 100, 979 P.2d 1120, 1126 (citing *Life of the Land v. Land Use Comm'n,* 63 Haw. 166, 172, 623 P.2d 431, 438 (1981)).

The three-part jurisdictional limits test that this court utilizes is identical to the test employed by the federal courts in determining whether a party meets the standing requirements of article III of the United States Constitution:

We have treated standing as consisting of two related components: the constitutional requirements of Article III and nonconstitutional prudential considerations. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). We stated the requirements for an Article III case or controversy in *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982):

---

17. The record does not include that part of Fujimoto's deposition transcript.

Art. III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant ... and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision....

*Franchise Tax Bd. of California v. Alcan Aluminium Ltd.*, 493 U.S. 331, 335, 110 S.Ct. 661, 107 L.Ed.2d 696 (1990) (internal quotation marks omitted) (citations omitted). "Though the courts in Hawai'i are not subject to a 'cases and controversies' limitation like that imposed upon the federal judiciary by Article III, § 2 of the United States Constitution," this court has, on occasion, sought guidance from the federal standing doctrines. *Life of the Land*, 63 Haw. at 171–173, 623 P.2d at 438–39.

The *Franchise Tax* court held that a shareholder, a foreign corporation, had article III standing to challenge the taxes that its wholly-owned subsidiaries were required to pay.

The more difficult issue is whether respondents can meet the prudential requirements of the standing doctrine. One of these is the requirement that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin, supra*, 422 U.S., at 499, 95 S.Ct., at 2205. Related to this principle we think is the so-called .shareholder standing rule. As the Seventh Circuit observed, the rule is a longstanding equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment. [*Alcan Aluminum Ltd. v. Franchise Tax Bd. of State of Cal.*, 860 F.2d 688, 693 (7th Cir.1988) ]. There is, however, an exception to this rule allowing a shareholder with a direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated.

*Franchise Tax*, 493 U.S. at 336, 110 S.Ct. 661.

The United States Court of Appeals for the Seventh Circuit has explained the limitation on a shareholder's standing to sue as follows:

We noted [in *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333 (7th Cir.1989),] the important purpose served by the rule denying standing to sue to those who suffer only derivative injury. "When the injury is derivative, recovery by the indirectly injured person is a form of double counting. 'Corporation' is but a collective noun for real people—investors, employees, suppliers with rights and others." *Id.* at 1335–36.

A blow that costs "the firm" $100 injures one or more of those persons. If, however, we allow the corporation to litigate in its own name and collect the whole sum (as we do), we must exclude attempts by the participants in the venture to recover for their individual injuries. A fire that causes $100 worth of damage to "the corporation", and therefore reduces the value of investors' stock by $100, does not cause a total injury of $200—the net loss is $100, and everyone is made whole by an award of that sum to the firm. To avoid double counting courts must either restrict recoveries to the directly-injured party or attempt to apportion the recovery according to who bears the effects.

*Id.* at 1336. Because divvying up the loss would require a Herculean effort, we simply allow the firm to recover. Once the firm is made whole, the derivative victims are by the same token compensated.

*Weissman v. Weener*, 12 F.3d 84, 86 (7th Cir.1993).

To be sure, courts have on occasion denied stockholders' suits alleging injury, asserting that the stockholders lacked "standing" to bring such an action because the stockholders, "experiencing no direct harm, possess[ ] no primary right to sue." *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732 (3d Cir.1970) (emphasis added), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); *accord EMI Ltd. v.*

*Bennett,* 738 F.2d 994, 996–97 (9th Cir.), cert. denied, 469 U.S. 1073, 105 S.Ct. 567, 83 L.Ed.2d 508 (1984); *Stevens v. Lowder,* 643 F.2d 1078, 1080 (5th Cir.1981). But we do not read these cases as actually turning on the question whether the stockholder has suffered a sufficiently direct injury to establish Article III injury or causation. The courts do not conduct that kind of analysis. It may well be that if a minor injury is suffered by a large corporation it would be difficult to trace a "distinct and palpable injury" to a shareholder, *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), but that would certainly not be so if the damage was to a closely held corporation. Conceptually, then, the problem is not an Article III one. *See Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970) (economic injury satisfies Article III).

Standing and real-party-in-interest questions do overlap to the extent that both ask whether the plaintiff has a personal interest in the controversy. *See* 6A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1524, at 329–30 (1990). But the question whether the suit should be brought by the [shareholders] or the [c]orporation really depends, as we have noted, on considerations and conventions of corporate law—whether the corporation should be entitled to bring an action, at least in the first instance, without the distraction of stockholders' suits—which we think are brought into play under Rule 17(a) of the Federal Rules of Civil Procedure.[18]

*Whelan v. Abell,* 953 F.2d 663, 671–72 (D.C.Cir.1992).

In *Whelan,* the United States Court of Appeals for the District of Columbia Circuit held that a real-party-in-interest defense may not be raised at any time, "for the real party must have the opportunity to step into the 'unreal' party's shoes and should not be prejudiced by undue delay." A Rule 17(a) defense, characterized by the defendant as an article III standing issue, was not allowed when it was raised at the start of the trial and a "ratification" of the action by a bankruptcy trustee was not possible. The United States Court of Appeals for the Fifth Circuit reached a similar holding in *Ensley v. Cody Resources, Inc.,* 171 F.3d 315 (5th Cir.1999). Citing *Whelan,* the *Ensley* court noted that "the cases on shareholders lacking standing do not address injury in fact; indeed, in a closely held corporation the injury is obvious." *Id.* at 320. "The real issue is not whether there is jurisdiction, but the prudential limitation on our exercise of jurisdiction over a jus tertii/third party plaintiff.... [The defendant's] standing objection is a prudential limitation that constitutes an objection to the real party in interest under [FRCP Rule] 17(a)." *Id.* (footnote omitted). Thus, the *Ensley* court deemed the defendant's objection at the end of the plaintiff's case-in-chief to be untimely and, hence, held that the objection had been waived. *Id.*

In *Wilson v. AIG Hawaii Ins. Co.,* 89 Hawai'i 45, 968 P.2d 647 (1998), reversing the ICA's judgment, we held that an insured was not the real party in interest with respect to a claim for no-fault benefits to satisfy her medical provider's unpaid surgery bill. We discussed the distinction between the concepts of "standing" and "real party in interest" as follows:

The ICA recognized that "[t]he difference between having 'standing' and being a 'real party in interest' is often confused." ... These distinctions were previously analyzed in *Lagondino v. Maldonado,* 7 Haw. App. 591, 789 P.2d 1129, *cert. denied,* 71 Haw. 668, 833 P.2d 900 (1990).

In *Lagondino, supra,* a general contractor sued a homeowner for payment under

---

18. Federal Rules of Civil Procedure (FRCP) Rule 17(a) differs from HRCP Rule 17(a), *see supra* note 3, only in that the former contains a provision that "when a statute of the United States so provides, an action for the use or benefit of another shall be brought in the name of the United States." This difference is not material to the present matter. "Where we have patterned a rule of procedure after an equivalent rule within the FRCP, interpretations of the rule by the federal courts are deemed to be highly persuasive in the reasoning of this court." *Gold v. Harrison,* 88 Hawai'i 94, 105, 962 P.2d 353, 364 (1998) (quoting *Kawamata Farms v. United Agri Products,* 86 Hawai'i 214, 255, 948 P.2d 1055, 1096 (1997)).

a construction contract. *Id.* The circuit court dismissed the suit on the ground that the contractor lacked standing to sue for payment under the contract because the contractor had assigned all his rights under the contract to a performance bondholder. *Id.* at 594, 789 P.2d at 1131. On appeal, the ICA acknowledged the difference between "standing" and a "real party in interest," and stated:

> We note that the [defendants] advance the concept of 'standing' in their objection to [plaintiff] maintaining the action. In our view their objection should be that [plaintiff] is not a 'real party in interest' under [HRCP] Rule 17(a). The courts utilize standing doctrines to refrain from determining the merits of a legal claim 'on the ground that even though that claim may be correct the litigant advancing it is not properly situated to be entitled to its judicial determination.' 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* 2d § 3531 at 338–39 (1984). *See also Bank of Hawai'i v. Horwoth,* 71 Haw. 204, 214, 787 P.2d 674, 680 (1990); *Life of the Land v. Land Use Comm'n,* 63 Haw. 166, 172, 623 P.2d 431, 438 (1981). On the other hand, the real party in interest concept under Rule 17(a) 'is a means to identify the person who possess the right sought to be enforced.' 6A C. Wright, A. Miller & M. Kane [Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane], *Federal Practice and Procedure: Civil* 2d § 1542 at 327 (1990) (footnote omitted).

*Id.* at 595, 789 P.2d at 1132.

Relying on these principles, our inquiry in this case is not based on Wilson's "standing," but rather on whether Wilson is a "real party in interest[.]"

*Id.* at 47–48, 968 P.2d 649–50 (some brackets added and some in original).

In the present matter, Fujimoto correctly argued in the circuit court that the question of his alleged "standing," as raised by Au's and Jorgensen's motions, was actually the question whether he was the "real party in interest," which was properly governed by HRCP Rule 17(a). Being part-

owner of a closely held corporation whose assets included, or were commingled with, his lifetime savings, Fujimoto was obviously directly interested in the recovery of the funds that he had invested. Nevertheless, by virtue of the corporation's potential claim of entitlement to these monies, J & J could plausibly be viewed as the real party in interest with respect to Fujimoto's claim, within the meaning of HRCP Rule 17(a). Fujimoto's counsel conceded that the funds at issue were the property of the corporation and that Fujimoto had intended the investment to be that of the corporation. But if the claim pursued by Fujimoto belonged to J & J, the proper remedy was not to the dismiss the claim, but, rather, "ratification of commencement of the action by, or joinder or substitution of, the real party in interest[.]" HRCP Rule 17(a), *see supra* note 3.

The Arizona Court of Appeals considered a similar problem in *Toy v. Katz,* 192 Ariz. 73, 961 P.2d 1021 (Ct.App.1998). The Toys brought a legal malpractice action against an attorney who had represented them in connection with the sale of some of the assets of a corporation that they owned. The attorney erroneously identified the Toys as the sellers of the assets in the papers documenting the transaction, thus exposing the Toys to personal liability for the sellers' obligations under the agreement. The defendant maintained that the corporation was the actual seller and, therefore, that the Toys lacked standing to recover damages suffered by the corporation as a result of the faulty drafting of the sale documents. The *Toy* court recognized that the case raised a real party in interest issue, rather than a jurisdictional question of standing, and, citing the final sentence of Rule 17(a), *see supra* note 3, ruled as follows:

> Here, although the trial court expressly found that the Corporation was the real party in interest, the court ignored the plain language of Rule 17 and erred in ruling that the amendment adding the Corporation did not relate back. This case presents the precise factual scenario for which the above provision of Rule 17(a) was created. "The provision is intended to prevent forfeiture when determination of

the proper party to sue is difficult or when an understandable mistake has been made." State Bar Committee Note at 169.

In this case, because the Toys had been identified as the sellers, their counsel named the Toys as the plaintiffs in the Business Litigation. During discovery in the underlying litigation, it became apparent that the assets [at issue] belonged to the Corporation. The Toys maintain that fact was obscured by Katz's alleged negligence in misidentifying them in the sale transaction documents. Under these circumstances, Rule 17(a) permits relation back of the amended complaint and the addition of the Corporation as a plaintiff. *See Watts[ v. State* ], ... 115 Ariz. 545, 566 P.2d [693,] 695–96 [ (Ct.App.1977) ]; *Hess v. Eddy,* 689 F.2d 977, 980 (11th Cir.1982), *cert. denied,* 462 U.S. 1118, 103 S.Ct. 3085, 77 L.Ed.2d 1347 (1983).

*Toy,* 961 P.2d at 1035–36.

In the present matter, Fujimoto was identified as the investor in his limited partnership agreement with Kailua Estates. Unlike the circumstances in *Toy,* however, the discovery process in the course of litigation did not render the true ownership of the invested funds apparent. The circuit court did not expressly rule regarding the precise legal status of the invested funds vis-a-vis the parties. It appears that such a ruling would have required factual determinations that could not be made based on the record before the circuit court at the hearing on Au's and Jorgensen's motions for summary judgment. However, the circuit court did determine that Fujimoto had intended the investment to be J & J's. In view of the position taken by Fujimoto's counsel, such a determination was not clearly erroneous, especially given the concession by Fujimoto's counsel that the invested funds belonged to J & J. Assuming, as the circuit court reasonably could, that the limited partnership agreement identified Fujimoto as the investor by virtue of some error, the *Toy* analysis applies to the present matter, and a ratification, joinder, or substitution of the corporation as a party plaintiff was the appropriate remedy.

Although the circuit court erroneously concluded that Fujimoto did not have standing to proceed with the present action, it recognized that HRCP Rule 17(a) was relevant to its ruling. It disallowed ratification, joinder, or substitution of parties on the grounds that the original naming of Fujimoto as a party plaintiff had not been an "understandable, honest mistake." In this connection,

[t]he provision that no action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed, after the objection has been raised, for ratification, substitution, etc., is added simply in the interests of justice. In its origin the rule concerning the real party in interest was permissive in purpose: it was designed to allow an assignee to sue in his own name. That having been accomplished, the modern function of the rule in its negative aspect is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata.

This provision keeps pace with the law as it is actually developing. Modern decisions are inclined to be lenient when an honest mistake has been made in choosing the party in whose name the action is to be filed—in both maritime and nonmaritime cases. *See Levinson v. Deupree,* 345 U.S. 648, 73 S.Ct. 914, 97 L.Ed.2d 1319 (1953); *Link Aviation, Inc. v. Downs,* 325 F.2d 613 (D.C.Cir.1963). The provision should not be misunderstood or distorted. It is intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made.

FRCP Rule 17 Advisory Committee's Note to 1966 amendment.

Following the advisory committee's note, courts have held that "when the determination of the right party to bring the action was not difficult and when no excusable mistake had been made, then the last sentence of Rule 17(a) was not applicable and the action should be dismissed." 6A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1555 (2d ed.1990); *see also*

*Rinke v. Johns–Manville Corp.*, 47 Wash. App. 222, 228, 734 P.2d 533 (1987) ("Most courts . . . have restricted relation back to situations where there has been an 'honest mistake' or an 'understandable mistake' in naming an improper party.") Courts have not given the provision a literal interpretation, which would make it applicable to every case where an incorrect plaintiff is named. *See Federal Practice* § 1555. "[T]he rule should be applied only to cases in which substitution of the real party in interest is necessary to avoid injustice." *Id.* This court found that restricting relation back to situations involving honest or understandable mistakes is to "prevent plaintiffs from using the rule to join or substitute persons whose interests were not contemplated from the beginning of the suit." *Rinke*, 47 Wash.App. at 230, 734 P.2d 533. But noting that modern rules of procedure are "intended to allow the court to reach the merits," the *Rinke* court added that [Rule] 17(a) "is designed to expedite litigation, not to allow narrow constructions or technicalities to interfere with the merits of a legitimate controversy." *Id.* at 227, 734 P.2d 533.

*Sprague v. Sysco Corp.*, 97 Wash.App. 169, 982 P.2d 1202, 1204 (1999) (holding that debtor could substitute bankruptcy trustee as real party in interest employment discrimination action, inasmuch as (1) employer was not prejudiced by substitution and (2) substitution changed nothing except who would benefit from action) (ellipsis points in original) (some brackets added and some in original). *See also Beal v. City of Seattle*, 134 Wash.2d 769, 954 P.2d 237 (1998) (holding that Rule 17(a) allowed substitution of guardian ad litem of decedent's children by personal representative of decedent's estate in wrongful death action against city based on delayed response to 911 caller who was subsequently murdered by her husband, notwithstanding that plaintiff's counsel knew identity of proper party before complaint was filed but ran out of time to file paperwork to have plaintiff appointed personal representative before statute of limitations ran).

Although the district court retains some discretion to dismiss an action where there was no semblance of any reasonable basis for the naming of an incorrect party, *see generally* 6A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1555, at 415 (2d ed.1990), there plainly should be no dismissal where "substitution of the real party in interest is necessary to avoid injustice," *id. See, e.g.,* Fed.R.Civ.P. 15 Advisory Committee Notes (1966) (Rule 17(a) is designed "[t]o avoid forfeitures of just claims"); *Raynor Bros. v. American Cyanimid Co.*, 695 F.2d 382, 385 n. 4 (9th Cir.1982) (relation back of product-liability claim would be allowed after substitution of lessee, a partnership, for corporation partly owned by members of the partnership); *Metropolitan Paving Co. v. International Union of Operating Engineers*, 439 F.2d 300, 306 (10th Cir.) (relation back of unfair labor practices claim allowed after substitution of individual corporate members of a joint venture for the joint venture itself), *cert. denied*, 404 U.S. 829, 92 S.Ct. 68, 30 L.Ed.2d 58 (1971); *Crowder v. Gordons Transports, Inc.*, 387 F.2d 413, 417–18 (8th Cir.1967) (relation back of wrongful-death claim allowed after substitution of surviving children's guardian for decedent's administratrix). A Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants.

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir.1997) (allowing substitution of shareholders for corporation as real party in interest in action against short sellers based on alleged violations of federal securities laws, inasmuch as (1) complaint's only pertinent flaw was identity of party pursuing claim and amended complaint was virtually identical to original complaint, (2) there was mistake as to legal effectiveness of assignment of claims of shareholders to corporation, although attempted assignment was "tactical" and "strategic" decision by counsel, (3) there was no unfairness to defendants in allowing substitution, and (4) it would have been unjust to foreclose plaintiff's pursuit of claims by virtue of otherwise inconsequential error).

The record in the present matter does not support the circuit court's conclusion that naming Fujimoto as a plaintiff was not an "understandable, honest mistake." There is no evidence that Fujimoto or his counsel made a tactical decision not to sue in J & J's name. In fact, Fujimoto's counsel's representations at the June 29, 1998 hearing suggest that J & J was not named as a party because of concerns that it would be subject to the very challenge that was levied against Fujimoto's participation in the litigation. Fujimoto reasoned that, inasmuch as he executed the document evidencing his investment in his personal capacity, it also evidenced his right to sue individually for the wrong arising out of the investment. In light of the closely held character of Fujimoto's corporation, the uncertain state of the corporation's ownership, either Fujimoto's control of at least a part of the corporation's assets or his commingling of the corporate assets with his personal assets, and the fact that Fujimoto acted in his personal capacity in dealing with the partnerships, the determination regarding the correct party to bring the action was difficult, and any mistake with respect to the identity of the right party is excusable.

■ Moreover, for the circuit court to have allowed J & J to ratify the action or to have permitted joinder or substitution of the parties would in no way have prejudiced the defendants in the present matter. Such steps would have changed nothing except the identity of the party entitled to recovery. Under these circumstances, the dismissal of Fujimoto's claims amounted to allowing "narrow constructions or technicalities to interfere with the merits of a legitimate controversy." See Sprague, 982 P.2d at 1204 (citation and internal quotation marks omitted). Even if mistaken, there was a reasonable basis for naming Fujimoto as plaintiff in the present matter, inasmuch as he was the party in privity with the defendant partnerships and their general partners. Cf. Zimmerman v. First Fed. Sav. & Loan Ass'n,

848 F.2d 1047, 1056 (10th Cir.1988); Campbell Soup Co. v. Diehm, 111 F.Supp. 211, 214–15 (D.C.Pa.1952) (maker of third-party beneficiary contract is real party in interest under FRCP Rule 17(a)). Accordingly, it would be unjust to foreclose Fujimoto's claim by virtue of this error, and, in our view, "substitution of the real party in interest is necessary to avoid injustice." See Advanced Magnetics, 106 F.3d at 20 (citation and internal quotation marks omitted). Inasmuch as we agree that "[a] Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants," id., we hold that the circuit court erred in dismissing Fujimoto's claim without allowing a ratification, joinder, or substitution. On remand, therefore, we direct the circuit court to allow Fujimoto to obtain ratification of his action from J & J Auto Repair, Inc.

B. *The Circuit Court Erred In Dismissing The Plaintiffs' Derivative Action Claims On The Ground That They Did Not Comply With The Requirements Of HRCP Rule 23.1.*

■ It has long been held in this jurisdiction that limited partners may maintain a derivative action on behalf of a limited partnership pursuant to HRCP Rule 23.1. *Phillips v. Kula 200*, 2 Haw.App. 206, 209–10, 629 P.2d 119, 122 (1981); *see also R.S. Ellsworth, Inc. v. Amfac Corp.*, 65 Haw. 345, 348–50, 652 P.2d 1114, 1116–17 (1982). In *Phillips*, the Intermediate Court of Appeals (ICA) held that a limited partnership was an "association" within the meaning of Rule 23.1. Although Kailua Partners and Kailua Estates were never registered with DCCA, and therefore were not limited partnerships pursuant to HRS ch. 425D, *see supra* note 10, they were, nevertheless, "partnerships" for purposes of the Uniform Partnership Act, see HRS § 425–106 (1993).[19] Inasmuch as

---

**19.** During the time period relevant to the present matter, HRS § 425–106(1) (1993), a section of the Uniform Partnership Act, HRS §§ 425–101 through 425–143 (1993), provided in relevant part that "[a] partnership is an association (including a joint venture) of two or more persons to carry on as co-owners a business for profit." In 1999, the legislature enacted a revised Uniform Partnership Act, effective July 1, 2000, by repealing the former HRS §§ 425–101 through

Kailua Partners and Kailua Estates were engaged in a joint venture with one another, as recited in Kailua Partners' partnership agreement, and, moreover, shared a common goal and were managed by the same individuals, the entity comprising Kailua Partners and Kailua Estates was one partnership for purposes of the partnership law. *Cf. Shinn v. Edwin Yee, Ltd.*, 57 Haw. 215, 217–20, 553 P.2d 733, 736–38 (1976) ("A joint venture is a mutual undertaking by two or more persons to carry out a single business enterprise for profit. It is closely akin to a partnership, and the rules governing the creation and existence of partnerships are generally applicable to joint ventures.") (Citation omitted.). Furthermore, the purpose underlying the statutes requiring that a certificate of limited partnership be filed in order to form a limited partnership is to ensure notice to third persons, and failure to comply with the filing requirement does not affect the rights, among themselves, of the parties to the partnership agreement. *Rond v. Yeaman–Yordan–Hale Productions*, 681 P.2d 1240, 1242 (Utah 1984); *Brown v. Brown*, 15 Ariz.App. 333, 488 P.2d 689, 695 (1971); *Hoefer v. Hall*, 75 N.M. 751, 411 P.2d 230, 232–33 (1966). Consequently, the agreements signed by the plaintiffs establish the existence of a "limited partnership" relationship among the parties in the present matter in the sense in which the ICA construed the term in *Phillips*, pursuant to which the limited partners may maintain a derivative action against the general partners on behalf of the partnership provided that the requirements of HRCP Rule 23.1 are satisfied.

 To our knowledge, this court has not had occasion to discuss the verification requirement of HRCP Rule 23.1. However, we noted in *Chambrella v. Rutledge*, 69 Haw. 271, 281 & n. 7, 740 P.2d 1008, 1014 & n. 7 (1987), that HRCP Rule 23.1 follows the federal paradigm and deviates from Rule 23.1 of

the Federal Rules of Civil Procedure (FRCP) in only one respect, namely, that FRCP Rule 23.1 contains a requirement that the complaint "shall allege ... that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have." Consequently, "interpretations of the rule by the federal courts are ... highly persuasive in the reasoning of this court." *See Gold v. Harrison*, 88 Hawaiʻi 94, 105, 962 P.2d 353, 364 (1998), *supra* note 18.

In *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966), the United States Supreme Court held that a shareholder's derivative action—alleging corporate fraud—could not be dismissed on the grounds that the shareholder relied, in verifying the complaint, on her advisor's explanation, even though she did not understand the explanation. The *Surowitz* Court observed that the purpose of the verification requirement was to discourage "strike suits," *i .e.*, meritless suits filed to coerce corporate managers to settle in order to avoid protracted litigation, that "[t]he basic purpose of the [FRCP] was to administer justice through fair trials, not summary dismissals as necessary as they may be on occasion," and that the rules were designed to allow—rather than to prevent—the unsophisticated litigant to have his day in court. *Id.* at 371–74, 86 S.Ct. 845. *See also Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir.1982) (reliance on Wall Street Journal article could be basis for verification of stockholder derivative complaint); *Hirshfield v. Briskin*, 447 F.2d 694, 698 (7th Cir.1971) (verification requirement was met where plaintiff's counsel attested to truth of certain facts in complaint and further attested on information and belief to other elements of complaint).

 The plaintiffs' verification of their derivative claims in the present matter was grounded in "information and belief," rather than personal knowledge. Our view of the

425–143 and replacing them with revised provisions, *see* HRS §§ 425–101 through 425–144 (Supp.2000). However, the revised Uniform Partnership Act retains essentially the same definition of partnership as the former HRS § 425–106 (1993), *see* HRS §§ 425–101 and 425–109 (Supp.2000).

The DCCA's findings, which the circuit court adopted in its July 7, 1999 order, *see supra* note 12, state, *inter alia*, that "Respondents [ (*i.e.*, Kailua Estates, Kailua Partners, Weimer, and Kim) ] are believed to be associations or organizations of individuals including, but not limited to the Respondents specifically named and identified above."

overwhelming weight of authority suggests that the circuit court erred in insisting that HRCP Rule 23.1 requires verification upon personal knowledge and that the plaintiffs' verification was inadequate for that reason.

When a derivative claim is asserted without the plaintiff's verification, courts have generally granted the plaintiff leave to replead the complaint and properly verify it. *Smachlo v. Birkelo*, 576 F.Supp. 1439, 1442–43 (D.Del.1983). In *Weisfeld v. Spartans Industries, Inc.*, 58 F.R.D. 570, 577–78 (S.D.N.Y.1972), the court remedied the plaintiff's failure to verify a complaint by allowing an affidavit of verification when it was apparent that the previous failure was a mere oversight. *See also Nussbacher v. Continental Illinois Bank & Trust Co. of Chicago*, 61 F.R.D. 399, 401 (D.C.Ill.1973) ("The best authorities maintain that failure to verify is a technical defect, curable by amendment. 2 Moore, *Federal Practice* ¶ 3.04 2d Ed. (1970); 7A, C. Wright & A. Miller, *Federal Practice and Procedure* § 1827 (1972)."). In *Deaktor v. Fox Grocery Co.*, 332 F.Supp. 536, 541 (W.D.Pa.1971), the court went further, permitting the plaintiff to forego the verification requirement altogether when it became apparent from the plaintiff's deposition that he was fully cognizant of the complaint's allegations and stating that "[r]equiring [the plaintiff] to verify the complaint at this late date would be mere formalism."

■ "In this jurisdiction, we have said: 'The Rules of Civil Procedure are to be liberally construed to promote justice,' and the court may depart from the literal application of the rule where such action is necessary to prevent the miscarriage of justice." *Bagalay v. Lahaina Restoration Foundation*, 60 Haw. 125, 141, 588 P.2d 416, 426 (1978) (quoting *Struzik v. City and County of Honolulu*, 50 Haw. 241, 246, 437 P.2d 880, 884 (1968)). The liberal pleading standards of the rules of civil procedure suggest that the fact that the plaintiffs' verification was submitted by affidavits several months after the complaint had been filed should not be deemed fatal to their derivative claims.

The present matter is very different from *Ellsworth*, in which this court denied the plaintiff limited partners' request to amend their complaint on appeal to assert a derivative action on behalf of the partnership when the limited partners' individual claims were themselves derivative in nature and should have been asserted on behalf of the partnership in the first place. The *Ellsworth* court denied the plaintiffs' appellate request on the basis that the defendants would have been unduly prejudiced if the complaint were to be amended to plead the derivative action after nearly six years of litigation. *Ellsworth*, 65 Haw. at 353, 652 P.2d at 1119. Indeed, the *Ellsworth* plaintiffs had deliberately failed to seek leave of the trial court to amend their complaint to bring a derivative action on behalf of the partnership, insisting that their claims were personal in nature. *Id.* In declining to remand the case to allow the plaintiffs to amend the complaint, this court emphasized that the procedural distinctions between direct and derivative actions were not merely a matter of form, but, rather, were grounded in sound equitable considerations. *Id.* at 350–51, 652 P.2d at 1118. *Cf. Abeloff v. Barth*, 119 F.R.D. 332 (D.Mass. 1988) (claims asserted by individual limited partners for breach of duty owed by general partners to partnership belonged to the partnership, requiring compliance with prerequisites to derivative suit, and were ordered dismissed unless plaintiffs filed amended complaint within thirty days in accordance with Rule 23.1, including allegation that demand on general partners would be unavailing).

In stark contrast to *Ellsworth*, the plaintiffs in the present matter expressly asserted derivative claims in their original complaint. Their initial failure to verify their complaint was a technical error and was corrected relatively quickly. The landowners' motion to dismiss for failure to follow the requirements of HRCP Rule 23.1 appears to have been responsive to the plaintiffs' filing of affidavits verifying their complaint. The defendants would have suffered no prejudice had the circuit court allowed the plaintiffs to maintain their derivative claims by supplying the verifications at that early stage of the proceeding. Provided that the other imperatives of HRCP Rule 23.1 were satisfied, no policy interest underlying the requirement of a ver-

ified derivative claim would have been injured.

HRCP [Rule] 23.1 ... requires that the complaint "shall be verified and shall allege that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law." ... This provision of "contemporaneous" ownership or membership serves "as a safeguard against champertous litigation by shareholders." 7C C. Wright, A. Miller & M. Kane, *supra,* § 1828, at 61.

*Chambrella,* 69 Haw. at 281, 740 P.2d at 1014. When the complaint does not allege that the plaintiff was a shareholder at the time of the alleged wrong, some courts have dismissed the derivative claims, while at the same time allowing leave to amend. *Harris · v. American Investment Co.,* 523 F.2d 220, 228 (8th Cir.1975). Other courts have allowed the derivative action to proceed when the complaint adequately indicated the required contemporaneousness of ownership, at least when it was clear that the stock was not bought to "speculate in litigation." *Heilbrunn v. Hanover Equities Corp.,* 259 F.Supp. 936, 939 (S.D.N.Y.1966); *see also Western Tool & Mfg. Co. v. Massena,* 142 F.2d 404, 408 (6th Cir.1944), *reversed on other grounds sub nom, Price v. Gurney,* 324 U.S. 100, 65 S.Ct. 513, 89 L.Ed. 776 (1945).

In this case, the plaintiffs did not specifically allege in their complaint that they were limited partners of Kailua Estates or Kailua Partners at the time of the alleged wrongs, but the allegation is clearly implied. The wrongdoing complained of was the diversion of the funds invested in the project by limited partners. There is no allegation or evidence in the record that the plaintiffs are litigating a purchased grievance or that they might be "speculative" litigators. "Therefore, it would exalt form over substance to hold that [the plaintiffs] did not have standing to maintain [their] derivative claims." *Bateson v. Magna Oil Corp.,* 414 F.2d 128, 131 (5th Cir.1969).

The landowners argued in the circuit court that the wrong alleged in the plaintiffs' complaint sprang from Kailua Partners' entering into the land purchase agreement, an event that occurred before any of the plaintiffs became limited partners. However, the

"continuing wrong" exception to the contemporaneous [ownership] rule allows one who acquired his stock after the transaction of which he complained to maintain a derivative suit on the theory that the alleged "wrong" commenced before the stock acquisition but was continuing and *not executed and final* until sometime after the plaintiff acquired his stock.

*Brambles USA, Inc. v. Blocker,* 731 F.Supp. 643, 649 (D.Del.1990) (emphasis added); *see also Saylor v. Bastedo,* 78 F.R.D. 150, 152–53 (S.D.N.Y.1978) ("The exception applies to a shareholder acquiring an interest in a corporation injured by a plan commenced before the date of share acquisition but not fully executed until afterward."). Thus, the continuing wrong exception applies only when the wrongful activity "continues to place in jeopardy of loss the corporation on behalf of which the would-be plaintiff seeks redress." *Saylor,* 78 F.R.D. at 153.

*Aurora Credit Services, Inc., v. Liberty West Development, Inc.,* 970 P.2d 1273, 1278 (Utah 1998) (brackets in original).

The continuing wrong exception should not be applied in all situations where a transaction is challenged because "in one sense every wrongful transaction constitutes a continuing wrong to the corporation until remedied." *Newkirk[ v. W.J. Rainey, Inc.,* 76 A.2d 121, 123 (Del.Ch. 1950) ]. "[W]hat must be decided is when the specific acts of alleged wrongdoing occur, and not when their effect is felt." *Schreiber v. R.G. Bryan,* ... 396 A.2d 512, 516 ( [Del.Ch.] 1978).

*Blocker,* 731 F.Supp. at 649 (footnotes omitted).

The escrow payments to the landowners, pursuant to the land purchase agreement, were made at a time when at least one of the plaintiffs (Fujimoto) was a limited partner. These payments fall within the "continuing wrong" paradigm, inasmuch as they were alleged to have been made

"pursuant to a plan commenced before the date of share acquisition but not fully executed until afterward," and they "continued to place in jeopardy of loss the [partnerships] on behalf of which the ... plaintiff[s sought] redress." *Saylor,* 78 F.R.D. at 152–53. Even though Fujimoto invested in Kailua Estates, rather than Kailua Partners, the plaintiffs' derivative claim was effectively asserted on behalf of the joint venture, comprised of Kailua Partners and Kailua Estates, which was the actual entity in which the plaintiffs had invested. *See Shinn,* 57 Haw. at 217–20, 553 P.2d at 736–38. Furthermore, the plaintiffs' complaint alleged diversion of partnerships' funds not only to the landowners, but also for the personal use of the general partners, the alleged diversion occurring both before and after the plaintiffs made their investments. Thus, the contemporaneous ownership requirement of HRCP Rule 23.1 was satisfied in the present matter.

HRCP [Rule] 23.1 further compels the suing shareholder in a derivative action to "allege with particularity" the efforts he made "to obtain the action he desires from the directors or comparable authority and from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort." ... This is, of course, consistent with the notion that the corporation should have an opportunity to "vindicate its own rights, but when ... those who perpetrated the wrongs also were able to obstruct any remedy, equity would hear and adjudge the corporation's cause through its [shareholder] with the corporation as a defendant, albeit a rather nominal one." *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. [541,] at 548, 69 S.Ct. [1221] at 1226[, 93 L.Ed. 1528 (1949)].

*Chambrella,* 69 Haw. at 281–82, 740 P.2d at 1014 (brackets in original).

[A]lthough Rule 23.1 clearly contemplates both the demand requirement and the possibility that demand may be excused, it does not create a demand requirement of any particular dimension. On its face, Rule 23.1 speaks only to the adequacy of the shareholder representative's pleadings.... The purpose of the demand requirement is to "affor[d] the directors an opportunity to exercise their reasonable business judgment and 'waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right.'" *Daily Income Fund, Inc. v. Fox,* 464 U.S. [523] at 533, 104 S.Ct. [831] at 836–837, [78 L.Ed.2d 645 (1984)], quoting *Corbus v. Alaska Treadwell Gold Mining Co.,* 187 U.S. 455, 463, 23 S.Ct. 157, 160, 47 L.Ed. 256 (1903). Ordinarily, it is only when demand is excused that the shareholder enjoys the right to initiate "suit on behalf of his corporation in disregard of the directors' wishes." R. Clark, *Corporate Law* § 15.2, p. 640 (1986).

*Kamen v. Kemper Financial Services, Inc.,* 500 U.S. 90, 96, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991).

In *Pogostin v. Rice,* ... 480 A.2d 619 [ (Del.1984),] and *Aronson v. Lewis,* ... 473 A.2d 805 [ (Del.1984),] the Delaware Supreme Court set forth its views as to the demand futility requirement. A demand is futile only where, "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgement." *Aronson,* 473 A.2d at 814. This inquiry permits a court to determine whether any action by the board in response to a demand would be tainted by the self-interest of the directors. Any board action requires a majority. Accordingly, allegations of futility require particularized allegations that a majority of the board would be so tainted. *See e.g. Bergstein v. Texas International Company,* ... 453 A.2d 467 [ (Del. Ch.1982)] (because a majority of the board of directors was self-interested for demand purposes, demand held futile.)

*In re E.F. Hutton Banking Practices Litigation,* 634 F.Supp. 265, 271 (S.D.N.Y.1986). "An 'interested' director is one who receives 'a personal financial benefit from the challenged transaction which is not equally shared by the stockholders.'" *In re General Instrument Corp. Securities Litigation,* 23 F.Supp.2d 867, 874 (N.D.Ill.1998) (quoting *Rales v. Blasband,* 634 A.2d 927, 933 (Del. 1993)). The directors' conduct meets the

"business judgment" test when, in making a business decision, the directors have acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company. *Aronson*, 473 A.2d at 812. We subscribe to the view of the Alabama Supreme Court, consistent with

> the plurality's statement in *Shelton[ v. Thompson*, 544 So.2d 845, 849 (Ala.1989),] that to show futility the shareholder or policyholder must demonstrate such a degree of antagonism between the directors and the corporate interest that the directors would be incapable of performing their duty. We agree with *In re Kaufman [Mutual Fund Actions*, 479 F.2d 257, 265 (1st Cir.1973), *cert. denied*, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973),] that a derivative action plaintiff should not be able to circumvent the Rule 23.1 director-demand requirement with a bare allegation that a majority of the directors are wrongdoers. At the same time, our case law clearly indicates, and has so indicated for nearly a century, that where the majority of the directors are themselves the alleged wrongdoers, a derivative action plaintiff can be excused from director-demand because such a demand can be deemed futile.

*Elgin v. Alfa Corp.*, 598 So.2d 807, 815 (Ala. 1992) (footnote omitted).

■ "When there is a conflict of interest in the directors' decision not to sue because the directors themselves have profited from the transaction underlying the litigation or are named defendants, no demand need be made and shareholders can proceed directly with a derivative suit." *Joy v. North*, 692 F.2d 880, 887–88, (2d Cir.1982). "[I]n cases involving allegations of patently egregious board conduct such as converting corporate funds or self-dealing, demand almost always would be futile." *Reimel v. MacFarlane*, 9 F.Supp.2d 1062, 1066 & n. 6 (D.Minn.1998) (citing cases involving misappropriation of corporate funds by board members).

> In a situation where a derivative suit is brought against the majority of the directors of a corporation for wilful or negligent breach of their fiduciary duties[,] a demand as a prerequisite to the bringing of a suit is almost always excused. *Jannes*

*v. Microwave Communications, Inc.*, [57 F.R.D. 18 (N.D.Ill.1972) ]. Similarly[,] the demand is excused where the board of directors is subject to the control of the alleged wrongdoers and is hostile to the Plaintiff's claim. *Schreiber v. Jacobs*, 121 F.Supp. 610 (E.D.Mich.1953); *Liboff v. Wolfson*, 437 F.2d 121 (5th Cir.1971); *Papilsky v. Berndt*, 59 F.R.D. 95 (S.D.N.Y. 1973).

*Walden v. Elrod*, 72 F.R.D. 5, 13 (W.D.Okla. 1976). *See also General Elec. Co. v. Bucyrus–Erie Co.*, 563 F.Supp. 970, 974 (S.D.N.Y. 1983) (when complaint alleges facts with sufficient particularity to show that demand would be futile, court need not decide whether complaint has adequately alleged that demand has been made; "[t]here is no noncompliance problem with Rule 23.1 on this score").

■ When "[t]he futility of seeking the desired action from the alleged wrongdoers is patent[,] ... efforts to obtain action by the directors and shareholders are not necessary, and the allegations of wrongdoing themselves adequately establish the reasons for not making the effort to obtain corporate action." *Hirsch v. Jones Intercable, Inc.*, 984 P.2d 629, 635 (Colo.1999) (quoting *Neusteter v. District Court*, 675 P.2d 1, 7 (Colo. 1984)) (service of demand on general partner before commencing derivative action on behalf of limited partnerships was excused by futility, where general partner, on whom limited partners would have served demand, was same interested entity that committed alleged breach of fiduciary duties, which consisted of allegedly (1) purchasing cable system owned by joint venture of limited partnerships for less than fair value, resulting in windfall, and (2) selling cable system to third party for profit; board of directors of corporate general partner, on whom demand would have been served, was composed of same interested persons who approved transactions).

■ Applying any of the foregoing formulations of the "demand futility" doctrine, the plaintiffs in the present matter were excused from making a demand on the managers of the partnerships to correct the wrongdoing alleged in their derivative claims.

For example, pursuant to the Delaware Supreme Court's *Aronson* test, a demand was futile, inasmuch as (1) the challenged transaction—*i.e,* the alleged diversion of the funds invested by the plaintiffs in the partnerships to the personal use of the defendants, particularly Weimer and Kim—would clearly not have been the product of a valid exercise of business judgment and (2) the managers—*i.e.,* Weimer and Kim—were not disinterested, having allegedly received a financial benefit from the challenged transaction, which was not equally shared by the shareholders. Because Weimer and Kim controlled the partnerships, for purposes of the *Aronson* test, they constituted "the majority of the board" allegedly tainted by self-interest.

Moreover, the plaintiffs' complaint did not merely set forth a bare allegation of wrongdoing, but further alleged that, despite attempts to communicate with the managers regarding their concerns, the plaintiffs had received no satisfactory response to their inquiries and were, therefore, unable to enforce the partnerships' rights. The complaint alleged specific instances of diversion of the partnerships' funds and various omissions that ensured the partnerships' failure. The complaint included a claim of wilful or negligent breach of the general partners' fiduciary duties to the partnerships. Thus, the futility of making a demand on the managers to obtain "the desired action"—*i.e.,* redress of the alleged wrongdoing—was "patent," and the plaintiffs' "allegations of wrongdoing," in themselves, "adequately establish[ed] the reasons for not making the effort to obtain corporate action." *Hirsch,* 984 P.2d at 635.

■ "Finally, the maintenance of a derivative action is contingent upon the plaintiff's ability to 'fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation.'" *Chambrella,* 69 Haw. at 282, 740 P.2d at 1014 (citation omitted).

Although the district court is thus empowered to dismiss a derivative action should it appear that the plaintiff does not adequately represent the shareholders in enforcing the rights of the corporation, a finding in the alternative is not required before a derivative action may go forward. *See Bernstein v. Levenson,* ... 437 F.2d 756, 757 [ (4th Cir.1971)]. The burden is on the defendants to obtain a finding of inadequate representation, and no such finding was obtained here below.

*Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 592 n. 15 (5th Cir.1974).

The Court recognizes that a critical element to be considered in determining the adequacy of a particular representative in a derivative action "is whether plaintiff's interests are antagonistic to those he is seeking to represent." Wright & Miller, 7A *Federal Practice and Procedure* § 1833 at 393 (1972 ed.). The Court also recognizes that it is defendants who must bear the burden of showing "that a serious conflict exists and that plaintiff could not be expected to act in the interests of the other shareholders because doing so would harm his other interests." *Id.* at 394.

*Ohio–Sealy Mattress Mfg. Co. v. Kaplan,* 90 F.R.D. 21, 25 (N.D.Ill.1980).

In *Davis v. Comed, Inc.,* a case concerning fair and adequate representation, the court wrote:

"The courts have examined several factors or elements in determining whether a particular derivative plaintiff can provide the requisite fair and adequate representation. Typically, the elements are intertwined or interrelated, and it is frequently a combination of factors which leads a court to conclude that the plaintiff does not fulfill the requirements of 23.1 (although often a *strong* showing of one way in which the plaintiff's interests are *actually inimical* to those he is supposed to represent fairly and adequately, will suffice in reaching such a conclusion). Among the elements which the courts have evaluated in considering whether the derivative plaintiff meets Rule 23.1's representation requirements are: economic antagonisms between representative and class; the remedy sought by plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; plaintiff's unfamil-

iarity with the litigation; other litigation pending between the plaintiff and defendants; the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; plaintiff's vindictiveness toward the defendants; and, finally, the degree of support plaintiff was receiving from the shareholders he purported to represent."

619 F.2d 588, 593–94 (6th Cir.1980) (Emphasis added.)

... [W]e are convinced from our review of federal case law and other authorities that ... courts may properly consider the above factors, as well as the factors that follow, in determining whether a derivative-action plaintiff fairly and adequately represents similarly situated shareholders.

In *Rothenberg v. Security Management Co.*, the Eleventh Circuit Court of Appeals stated:

"Whether a particular plaintiff will fairly and adequately represent the interests of other similarly situated shareholders as required by Rule 23.1 turns upon the total facts and circumstances of each case. Some of the factors considered by courts include: (1) indications that the plaintiff is not the true party in interest; (2) the plaintiff's unfamiliarity with the litigation and unwillingness to learn about the suit; (3) the degree of control exercised by the attorneys over the litigation; (4) the degree of support received by the plaintiff from other shareholders; (5) the lack of any personal commitment to the action on the part of the representative plaintiff."

667 F.2d 958, 961 (11th Cir.1982). (Citations omitted.) *See Larson v. Dumke*, 900 F.2d 1363 (9th Cir.1990) (which accepts the considerations given by *Davis v. Comed* and *Rothenberg* ).

*Elgin*, 598 So.2d at 818–19.

The circuit court in the present matter did not enter any findings regarding the adequacy of the plaintiffs' representation of the limited partners in enforcing the partnerships' rights. The landowners argued in the circuit court that the plaintiffs had "failed to verify that they fairly and adequately represent[ed other limited partners] similarly situated," but their argument missed the mark with respect to the applicable burden of proof. *See Smallwood*, 489 F.2d at 592 n. 15, and *Ohio–Sealy Mattress*, 90 F.R.D. at 25. The landowners also argued that it was "impossible for [the plaintiffs] to claim that they adequately and fairly represent other limited partners who are currently suing [the landowners] in a separate cause of action." While "other litigation pending between the plaintiff and defendants" is one of the factors considered by the courts in connection with the representation requirement of Rule 23.1, *see Elgin*, 598 So.2d at 818, the record contains no evidence of any other litigation currently pending between these plaintiffs and the defendants. "Other litigation" is relevant in the context of derivative actions because the derivative action may be used as leverage for purposes of obtaining a favorable settlement in a collateral dispute between the parties, thereby compromising the plaintiff's fitness to represent other shareholders. *Rothenberg*, 667 F.2d at 961; *Davis*, 619 F.2d at 597. However, the fact that *other* shareholders are suing the defendants pursuant to the same claims in another action does not implicate the concerns underlying the requirement of "fair and adequate representation." These concerns are directed at the presence of extrinsic factors that "render it likely that the representative may disregard the interests of the class members" because his interest extends beyond those of the class he seeks to represent. *Elgin*, 598 So.2d at 819. The record reflects no such problem with respect to the plaintiffs in the present matter, and neither the landowners nor Au have attempted to establish it. Consequently, the "adequate representation" requirement of HRCP Rule 23.1 is satisfied.

In light of the foregoing analysis, we hold that the circuit court erred both in granting the landowners' motion to dismiss the plaintiffs' derivative action with prejudice and in entering summary judgment in Au's favor and against the plaintiffs. We therefore vacate the circuit court's orders to the extent

that they undertook to do so.[20]

## C. The Circuit Court Erred In Imposing Sanctions On The Plaintiffs For Failure To Properly Plead Their Derivative Claims For Relief.

Although the circuit court erred in dismissing the plaintiff's derivative claims, the question remains whether it abused its discretion in imposing HRCP Rule 11[21] sanctions on the plaintiffs for the technical deficiencies in pleading their derivative claims for relief, namely, failure to verify the original complaint and the amended complaint and failure expressly to allege contemporaneous ownership and futility of demand. Our holding that the plaintiffs' derivative claims should not have been dismissed for inadequacy of pleading suggests that the circuit court abused its discretion in sanctioning the plaintiffs. *Cf. Les Mutuelles du Mans Vie v. Life Assurance Co. of Pennsylvania*, 128 F.R.D. 233, 240 (N.D.Ill.1989) (pleading of counts that were upheld over the defendant's motion to dismiss was presumptively nonsanctionable). Nevertheless, we briefly elucidate the applicable law, inasmuch as sanction orders of the circuit courts are reviewed for abuse of discretion, affording the circuit courts a substantial degree of deference. *See In Re Tax Appeal of Hawaiian Flour Mills*, 76 Hawai'i 1, 15, 868 P.2d 419, 433 (1994) ("Deployed on the front lines of litigation, the trial court 'is best acquainted with the local bar's litigation practices and thus best situated to determine when a sanction is warranted to serve Rule 11's goal of specific and general deterrence.' ") (Quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 404, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).).

The certification requirement of HRCP Rule 11 establishes a twofold standard, one objective, via the "frivolousness clause" (namely, the imperative that the filed document be supported by existing or dicoverable evidence and warranted by existing law or a good faith argument for the extension, modification or reversal of existing law), and the other subjective, via the "improper purpose clause." *Harrison v. Dean Witter Reynolds, Inc.*, 132 F.R.D. 184, 186 (N.D.Ill. 1990) (citing *Stotler & Co. v. Able*, 870 F.2d 1158, 1166 (7th Cir.1989)); *Les Mutuelles du Mans Vie*, 128 F.R.D. at 237 (citing *Tabrizi v. Village of Glen Ellyn*, 883 F.2d 587, 592 (7th Cir.1989); *Brown v. Federation of State Medical Boards*, 830 F.2d 1429, 1435–36 (7th Cir.1987)). "Rule 11's first (objective) branch in turn has two sub-branches: whether the party or attorney made a reasonable inquiry into the facts and whether the party or attorney made a reasonable inquiry into the law (*Brown*, 830 F.2d at 1435)." *Les Mutuelles du Mans Vie*, 128 F.R.D. at 237;

---

**20.** We note that, inasmuch as no final judgment has been entered regarding the plaintiffs' claims against the landowners, we do not have jurisdiction in this appeal over that part of the circuit court's June 19, 1997 order that (1) granted summary judgment in favor of the Sutherlands and the Skys and (2) imposed sanctions against the plaintiffs payable to the Sutherlands and the Skys for violations of HRCP Rule 11. *See Jenkins v. Cades Schutte Fleming & Wright*, 76 Hawai'i 115, 869 P.2d 1334 (1994).

**21.** The version of HRCP Rule 11 applicable to the present matter, *see supra* note 2, was identical to FRCP Rule 11 prior to the latter's amendment in 1993. Consequently, the federal cases interpreting the pre–1993 version of FRCP Rule 11 are relevant to our analysis in the present case. *See supra* note 18.

The amended HRCP Rule 11 (2000) provides in relevant part:
 **(b) Representations to Court.** By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
 (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
 (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
 (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
 (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.
FRCP Rule 11, as amended in 1993, contains the same provisions.

*see also Harrison,* 132 F.R.D. at 186. The fact that pleadings are not well grounded in law ordinarily suggests lawyer, rather than client, liability for Rule 11 sanctions. *Les Mutuelles du Mans Vie,* 128 F.R.D. at 242.

A showing of 'bad faith' is not required where the conduct of counsel is at issue. *Eastway [Construction Corp. v. City of New York,* 762 F.2d 243 (2d Cir.1985) ]. Rather, an objective standard, focusing on what a reasonably competent attorney would believe, is the proper test. *Id.* at 253; see *Calloway v. Marvel Entertainment Group,* 854 F.2d 1452, 1469–70 (2d Cir.1988). Where a party represented by an attorney is the target of a Rule 11 motion, however, the subjective good faith test applies. *Id.* at 1474.

*Greenberg v. Hilton Int'l Co.,* 870 F.2d 926, 934 (2d Cir.1989); *see also Harrison,* 132 F.R.D. at 193 ("The court does not choose to sanction plaintiffs because there seems little value or deterrence in sanctioning a party for an attorney's failure to reasonably investigate the law."); *Ballard's Service Center, Inc. v. Transue* (865 F.2d 447, 450 (1st Cir. 1989) () Rule 11 sanctions should be paid by plaintiff's attorney, rather than by plaintiff, when offense was improper attempt to remove case to federal court, which involved purely legal question of legitimacy of maneuver); *Blake v. National Cas. Co.,* 607 F.Supp. 189, 193 (C.D.Cal.1984) ("the attorney and not the client should bear the sanction for filing papers which violate Rule 11 by being unsupported by existing law").

In the present matter, the circuit court did not enter any findings describing perceived misconduct that justified the imposition of sanctions.

Although it is well-settled that an appellate court may affirm a judgment of the lower court on any ground in the record which supports affirmance, we believe that, in order to facilitate a meaningful and more efficient appellate review, an order imposing sanctions should set forth findings that describe, with reasonable specificity, the perceived misconduct (such as harassment or bad faith conduct), as well as the appropriate sanctioning authority (e.g., HRCP Rule 11 or the court's inher-

ent power). For purposes of appellate review, a distinction must be made between zealous advocacy and plain pettifoggery.

Whether sanctions are imposed pursuant to HRCP Rule 11 or pursuant to the court's inherent powers, the importance of specific findings that describe the perceived misconduct and the sanctioning authority is two-fold. First, as previously noted, it allows for more meaningful appellate review as to whether the trial court exercised its discretion in a reasoned and principled fashion. Second, it assures the litigants, and incidentally the judge as well, that the decision was the product of thoughtful deliberation, and their publication enhances the deterrent effect of the ruling. The sanction order issued in this case, however, does not contain specific findings; therefore, we are compelled to review the entire record for an abuse of discretion.

*Enos v. Pacific Transfer & Warehouse, Inc.,* 79 Hawai'i 452, 459, 903 P.2d 1273, 1280 (1995) (citations, internal quotation marks, ellipsis points, brackets, and footnote omitted).

▆▆ The record reflects that the circuit court believed that the plaintiffs' counsel, Yanagida, "did not read Rule 23.1" and that the plaintiffs' complaint was filed in "bad faith." The circuit court's view that Yanagida failed to consult HRCP Rule 23.1 prior to filing the complaints is patently mistaken, in light of the fact that much of the complaint's relevant verbiage traces the language of the rule. *See supra* notes 1 and 7. The circuit court's finding of a bad faith filing—as expressed in its oral ruling from the bench on April 30, 1997—lacks specificity and, based on our review, lacks support in the record. Absent a particularized finding of bad faith, the circuit court abused its discretion in sanctioning the plaintiffs. *See Greenberg,* 870 F.2d at 934.

▆▆ The circuit court also stated that it was "going on the failure to comply with the rules" and that failure to "comply with the procedural requirements in filing [the derivative action] was violation of Rule 11." However, "Rule 11 requires conduct more egregious than failure to comply with technical

pleading requirements [to justify imposition of sanctions]." *Macmillan, Inc. v. American Express Co.,* 125 F.R.D. 71, 79 (S.D.N.Y. 1989); *see also West Mountain Sales, Inc. v. Logan Manufacturing Co.,* 718 F.Supp. 1084, 1088 (N.D.N.Y.1989) (failure to plead fraud with particularity was not sanctionable pursuant to Rule 11). Furthermore, compliance with technical pleading requirements is quintessentially within the supposed competence of *counsel.* Because the circuit court's imposition of Rule 11 sanctions was predicated upon Yanagida's supposed failure reasonably to inquire into the law, the *plaintiffs,* as individuals, were not the proper subject of the Rule 11 inquiry. Accordingly, in levying sanctions against the plaintiffs for allegedly incompetent pleading of their derivative claims, the circuit court clearly exceeded the bounds of reason to the plaintiffs' detriment, and its decision must be reversed.

D. *The Circuit Court Erred In Granting Summary Judgment In Favor Of Au And Hewitt And Against The Plaintiffs On All Counts.*

1. *Exculpatory clause of the partnership agreement*

 Kailua Estates and Kailua Partners were not registered as limited partnerships with the DCCA. The filing of certificate of limited partnership is a statutory prerequisite to creation of a limited partnership, and, until it is filed, the partnership is not formed as a limited partnership. HRS § 425D–201, *supra* note 10; *see Klein v. Weiss,* 284 Md. 36, 395 A.2d 126, 136 (1978). "Unlike a general partnership, a limited partnership cannot be created by informal agreement; its existence depends upon compliance with the Uniform Limited Partnership Act [ (in this case, HRS ch. 425D) ]." *Inland Real Estate Corp. v. Christoph,* 107 Ill.App.3d 183, 63 Ill.Dec. 9, 437 N.E.2d 658, 662 (1982) (citing *Allen v. Amber Manor Apts. Partnership,* 95 Ill.App.3d 541, 51 Ill.Dec. 26, 420 N.E.2d 440 (1981)).

Limited partnerships were unknown at common law; they are exclusively a creature of statute, their main purpose being to permit a form of business enterprise, other than a corporation, in which persons could invest money without becoming liable as general partners for all debts of the partnership. 2 R. Rowley, *Rowley on Partnership* § 53.0 (2d ed.1960); 60 Am.Jur.2d *Partnership* § 371 (1972). "The general purpose of (limited partnership) acts was not to assist creditors, but was to enable persons to invest their money in partnerships and share in the profits without being liable for more than the amount of money they had contributed. The reason for this was to encourage investing." *Gilman Paint & Varnish Co. v. Legum,* 197 Md. 665, 670, 80 A.2d 906, 908 (1951).

. . . .

The creation of a limited partnership is not a mere private, informal, voluntary agreement as in the case of a general partnership, but is a public and formal proceeding which must follow the statutory requirements of the Uniform [Limited Partnership] Act. 2 J. Barrett and E. Seago, *Partners and Partnerships, Law and Taxation,* ch. 13, § 2.1 (1956); 2 Z. Cavitch, *Business Organizations* § 39.01(3) (1977); *Crane and Bromberg on Partnership* § 26.

*Klein,* 395 A.2d at 135–36. Inasmuch as the filing requirements of the Uniform Limited Partnership Act were not satisfied in the present matter, no limited partnership, within the meaning of the Act, has been formed; as a consequence, HRS ch. 425D does not govern the rights and liabilities of the parties.

 However, as noted *supra* in section III.B, "the failure to file the certificate of limited partnership does not affect the existence of the limited partnership as an entity, in a controversy between the partners themselves, where neither the interests of third parties nor a partner's claim of limited liability is involved ." *Rond,* 681 P.2d at 1242. Under those circumstances, the partnership agreement is enforceable as among the partners who will be held bound by their own contractual acts. *Id.; Heritage Hills v. Zion's First National Bank,* 601 F.2d 1023, 1026 (9th Cir.1979); *Betz v. Chena Hot Springs Group,* 657 P.2d 831, 834 (Alaska 1982); *Brown,* 488 P.2d at 695; *Porter v. Barnhouse,* 354 N.W.2d 227, 231 (Iowa 1984);

*Hoefer,* 411 P.2d at 233; *Riviera Congress Associates v. Yassky,* 25 A.D.2d 291, 268 N.Y.S.2d 854, 858 (N.Y.App.Div.1966); *Holvey v. Stewart,* 265 Or. 242, 509 P.2d 17, 18–19 (1973).

Au argues that the terms of the Kailua Partners partnership agreement forecloses any liability to the plaintiffs on his part except in the event of gross negligence or willful misconduct. He relies on the following exculpatory clause in the general partnership agreement, signed by Au, Kim, and Weimer, which was incorporated by reference into the limited partnership subscription agreements signed by each of the plaintiffs:

> Neither the General Partners nor any of their respective agents shall be liable to the Partnership or the Limited Partners for any act or omission based upon errors of judgment or other fault in connection with the business or affairs of the Partnership so long as the person against whom liability is asserted acted in good faith on behalf of the partnership and in a manner reasonably believed by such person to be within the scope of its authority under this Agreement and in the best interests of the Partnership but only if such action or failure to act does not constitute gross negligence or willful misconduct.

"As a general rule, the construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court." *Brown v. KFC Nat'l Management Co.,* 82 Hawai'i 226, 239, 921 P.2d 146, 159 (1996) (citations and internal quotation marks omitted).

It is true that a party can contract to exempt himself from liability for harm caused by his negligence. Comment to *Restatement 2nd of Contracts,* § 195; 15 *Williston on Contracts,* § 1750A at 144 (3d ed.1972). It is also true that "[s]uch bargains are not favored, however, and, if possible, bargains are construed not to confer this immunity." *Williston, supra,* § 1750A at 144–145.

In a case striking down an exculpatory provision in a ship towing contract, the United States Supreme Court stated, "The two main reasons for the creation and application of the rule [invalidating such provisions] have been (1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods or services from being overreached by others who have power to drive hard bargains." *Bisso v. Inland Waterways Corp.,* 349 U.S. 85, 91, 75 S.Ct. 629, 632, 99 L.Ed. 911 (1955). In light of these reasons, exculpatory clauses are valid only if:

> [t]hey are strictly construed against the promisee and will not be enforced if the promisee enjoys a bargaining power superior to the promisor, as where the promisor is required to deal with the promisee on his own terms.... Nor will a contract be enforced if it has the effect of exempting a party from negligence in the performance of a public duty, or where a public interest is involved....

*Lynch v. Santa Fe National Bank,* 97 N.M. 554, 627 P.2d 1247, 1249 (1981), quoting *Tyler v. Dowell, Inc.,* 274 F.2d 890, 895 (10th Cir.1960), *cert. denied,* 363 U.S. 812, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960) (citations omitted); *see* Annot., 6 A.L.R.3d 704, 705 (1966); Annot., [Griffiths v. Henry Broderick, Inc., 27 Wash.2d 901, 182 P.2d 18] 175 A.L.R. 1, 14–16 (1948)[1947]; 57 Am.Jur.2d *Negligence* §§ 20, 27–30 (1971).

*Krohnert v. Yacht Systems Hawaii, Inc.,* 4 Haw.App. 190, 198–99, 664 P.2d 738, 744 (1983) (ellipsis points and brackets in original). *See also Wolf v. Ford,* 335 Md. 525, 644 A.2d 522, 525–27 (1993) ("In the absence of legislation to the contrary, exculpatory clauses are generally valid, and the public policy of freedom of contract is best served by enforcing the provisions of the clause.... There are circumstances, however, under which the public interest will not permit an exculpatory clause in a contract.... The ultimate determination of what constitutes the public interest must be made considering the totality of the circumstances of any given case against the backdrop of current societal expectations." (Citations omitted.)); *Yauger v. Skiing Enterprises, Inc.,* 206 Wis.2d 76, 557 N.W.2d 60, 62 (1996) ("Exculpatory contracts are not favored by the law because they tend to allow conduct below the acceptable standard of care.... However, exculpa-

tory contracts are not automatically void and unenforceable. . . . Rather, a court closely examines whether such agreements violate public policy and construes them strictly against the party seeking to rely on them." (Citations omitted.)).

Parties are permitted to make [exculpatory] contracts so long as they are knowingly and willingly made and free from fraud. No public policy exists to prevent such contracts. However, exceptions exist where the parties have unequal bargaining power, the contract is unconscionable, or the transaction affects the public interest such as utilities, carriers, and other types of businesses generally thought to be suitable for regulation or which are thought of as a practical necessity for some members of the public. *Weaver v. American Oil Co.*, (1971) 257 Ind. 458, 276 N.E.2d 144; *LaFrenz v. Lake County Fair Board*, (1977) 172 Ind.App. 389, 360 N.E.2d 605. *General Bargain Center v. American Alarm Co., Inc.*, 430 N.E.2d 407, 411–12 (Ind.Ct. App.1982). In other words, "[e]xculpatory provisions are not favored by the law and are strictly construed against parties relying on them. Exculpatory clauses will be held void if the agreement is (1) violative of a statute, (2) contrary to a substantial public interest, or (3) gained through inequality of bargaining power." *Andrews v. Fitzgerald*, 823 F.Supp. 356, 378 (M.D.N.C.1993) (citing *Tatham v. Hoke*, 469 F.Supp. 914 (W.D.N.C. 1979)) (discussing North Carolina law).

There appears to be no question that the contracts at issue in the present matter, *i.e.*, the plaintiffs' limited partnership subscription agreements, were contracts between parties of unequal bargaining power. They were form contracts drafted by the promoters of the partnerships and were unilaterally proffered to the plaintiffs, who had no choice but to conform or decline participation. Accordingly, they were contracts of adhesion "in the sense that [they were] drafted or otherwise proffered by the stronger of the contracting parties on a 'take it or leave it' basis." *Brown*, 82 Hawai'i at 247, 921 P.2d at 167. Such contracts are "unenforceable if two conditions are present: (1) the contract is the result of coercive bargaining between parties of unequal bargaining strength; and (2) the contract unfairly limits the obligations and liabilities of, or otherwise unfairly advantages, the stronger party." *Id.*

In response to Au's argument regarding the exculpatory clause, the plaintiffs urge that the limited partnerships' contracts were rescinded "because [Kailua Estates] and [Kailua Partners] were fraudulent enterprises." Although the circuit court did not expressly adopt the portions of the DCCA's "cease and desist" orders, *see supra* note 12, that declared that "[a]ll contracts regarding the purchase or sale of the securities by Hawai['] i investors are hereby rescinded," it did expressly adopt all of the findings of fact set forth in the DCCA's preliminary and final "cease and desist" orders, *see id.*, which recited, *inter alia*, that:

11. In connection with the offer and sale of [the limited partnership interests, Weimer and Kim] made misrepresentations and/or untrue statements of material fact . . . including but not limited to, the following:

a. distributed materials, which purported to be memorandum of private offering, limited partnership agreements and subscription agreements giving the programs the appearance of limited partnerships when in fact no limited partnerships were registered with the State of Hawaii;

b. distributed packets of information which included a Deposit, Receipt, Offer and Acceptance ("DROA") to purchase the land for $1,000,000, while representing in the Project Profit Analysis that the land would be purchased for $900,000;

c. represented that the monies collected from the [Kailua Estates] investors would be used to develop the land and the [Kailua Partners] investor monies would purchase the land when nearly all of the monies went to . . . Weimer and Kim;

d. distributed correspondence which represented at least two different projected profit amounts raging from $17,870 to $42,870;

e. distributed correspondence to potential investors naming . . . Hewitt . . . as a [Kailua Partners] general partner although

he had only signed a general partnership agreement for [Kailua Estates].

12. In connection with the offer or sale of [the limited partnership interests, Weimer and Kim] omitted to state material facts necessary to in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... [including], but not limited to, the following:

a. the failure to meet the terms and conditions of the DROA for the purchase of the land, the subsequent request by the landowner to cancel the DROA and the ultimate cancellation of the DROA and escrow;

b. the failure to disclose to investors that finder's fees and/or commissions would be paid to ... Kim for finding investors;

c. the failure to disclose that investor monies were being converted from the programs by ... Weimer.

d. the failure to disclose that ... Kim's professional license as a real estate salesperson had been revoked by the State of Hawaii after failing to pay restitution in a failure to account for funds case;

e. the failure to disclose that the limited partnerships had never been registered in the State of Hawaii;

f. the failure to include the return of capital contribution amounts in the Projected Profit Analysis for [Kailua Estates];

g. the failure to include the cost of financing the purchase price of the property after closing in the Project Profit Analysis for [Kailua Partners].

The DCCA's findings of fact further included the plaintiffs among the persons to whom Weimer and Kim sold investment interests.

▇▇▇▇ Relevant to the plaintiffs' position is the following proposition to which this court adheres:

To constitute fraudulent inducement sufficient to invalidate the terms of a contract, there must be (1) a representation of a material fact, (2) made for the purpose of inducing the other party to act, (3) known to be false but reasonably believed true by the other party, and (4) upon which the other party relies and acts to [his or her] damage.

*Hawaii Community Federal Credit Union v. Keka*, 94 Hawai'i 213, 230, 11 P.3d 1, 18 (2000) (quoting *Pancakes of Hawaii, Inc. v. Pomare Properties Corp.*, 85 Hawai'i 300, 312, 944 P.2d 97, 109 (App.1997)) (other citations omitted). The DCCA's findings of fact established that Weimer and Kim knowingly made false or misleading representations regarding material facts for the purpose of inducing potential investors to enter into limited partnership subscription agreements. Thus, the first three elements of actionable fraudulent inducement, as set forth in *Keka* and *Pancakes Hawaii*, are satisfied. Although the DCCA's findings of fact do not themselves expressly recite that the plaintiffs detrimentally relied on those misrepresentations, the plaintiffs' declarations and affidavits, which were part of the record before the circuit court, do aver such reliance. Accordingly, the record before the circuit court presented a genuine issue of material fact as to whether the plaintiffs' subscription agreements were fraudulently induced.

Fraud vitiates all agreements as between the parties affected by it. If the agreement creating the joint adventure had its inception in fraud, it was, as between the parties to it, void *ab initio*. [A][p]laintiff[,] who was induced to enter into the joint adventure agreement by fraudulent representations, although he may have a dissolution on this ground, may also obtain a decree rescinding or cancelling the agreement *ab initio*.

*Peine v. Murphy*, 46 Haw. 233, 239, 377 P.2d 708, 712 (1962) (citations omitted). Put similarly, "[t]he general rule is that '[i]f a party's misrepresentation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.'" *Park v. Government Employees Ins. Co.*, 89 Hawai'i 394, 399, 974 P.2d 34, 39 (1999) (quoting *Restatement (Second) of Contracts* § 164(1) (1979)) (some brackets added and some in original).

▇▇▇▇ Contracts induced by fraud are inherently unfair and offensive to the public interest. To the extent that the plaintiffs'

limited partnership agreements were tainted by fraud, the general partners, including Au and Hewitt, may not rely on the exculpatory clause contained therein, the applicable provisions of the Uniform Partnership Act, HRS §§ 425–13 through 425–15 (1993), rendering Au and Hewitt vicariously liable for Weimer's and Kim's wrongdoing. *See infra* section III.D.2.

The exculpatory clause in the limited partnership agreements, by its terms, purports to absolve the general partners from liability for ordinary negligence, so long as they have acted in good faith and within the scope of their authority under the agreement. Likewise by its terms, however, the exculpatory clause excludes from its protections any "action or failure to act [that] constitute[s] gross negligence or willful misconduct." Construing the clause at issue "strictly ... against the promisee," *i.e.*, the general partners, who "enjoy[ed] a bargaining power superior to the promissor[s]," *i.e.*, the plaintiffs, *see Krohnert*, 4 Haw.App. at 199, 664 P.2d at 744, we hold that it may not be invoked to exonerate some of the general partners from joint and several liability for the gross negligence or willful misconduct of other of the general partners. In any event, insofar as the exculpatory clause at issue in the present case purports to relieve the general partners from vicarious liability, it is in direct conflict with the Uniform Partnership Act, *see infra* section III.D.2, and the statute must take precedence over the terms of the contract. *Cf. Taylor*, 90 Hawai'i at 307, 978 P.2d at 745 (1999) ("[B]ecause insurance policies are contracts of adhesion and are premised on standard forms prepared by the insurer's attorneys, we have long subscribed to the principle that they must be construed liberally in favor of the insured and any ambiguities must be resolved against the insurer.... Put another way, the rule is that policies are to be construed in accord with the reasonable expectations of a layperson.... In addition, insurance policies are governed by statutory requirements in force and effect at the time such policies are written.... Such provisions are read into each policy issued hereunder and become a part of the contract with full binding effect on each party.... Consequently, when the terms of an insurance contract are in conflict with statutory language, the statute must take precedence over the terms of the contract." (Internal quotation marks and citations omitted.) (Some brackets added and some omitted.)).

### 2. *Joint and several liability of general partners*

Partnership liability is rooted in agency principles and, in general, does not require actual participation in or knowledge of the acts performed before liability may be imposed. *Northwestern National Bank of Minneapolis v. Fox & Co.*, 102 F.R.D. 507, 512 (S.D.N.Y.1984). At common law, a partner was jointly liable for partnership debts, but jointly and severally liable for tort obligations. *Catalina Mortgage Co., Inc. v. Monier*, 166 Ariz. 71, 800 P.2d 574, 575 (1990) (citing *Johnson v. Gill*, 235 N.C. 40, 68 S.E.2d 788, 791 (1952)); *see Eastern Iron & Metal Co. v. Patterson*, 39 Haw. 346, 356–60 (1952); *Frank Nichols, Ltd. v. Rosa*, 33 Haw. 567 (1935).

In *Eastern Iron*, the plaintiff was a corporation defrauded as a result of the actions of the defendant Patterson. Patterson, acting as the agent of his own corporation, entered into a contract to sell certain cast-iron scrap to the plaintiff. Prior to entering into the contract, Patterson's corporation and a co-partnership formed a joint venture for the purpose of selling scrap iron and transferred the subject cast iron to the joint venture. Patterson diverted the plaintiff's partial payment for the cast-iron scrap to his corporation's benefit and rejected his corporation's contract with the plaintiff without returning the plaintiff's partial payment. The joint venture began shipping the subject cast-iron scrap to undisclosed destinations. The plaintiff brought an action for imposition of a constructive trust on the cast-iron scrap, damages, and injunctive relief. Patterson's joint venturers asserted as a defense that they had no knowledge of Patterson's sale of the cast-iron scrap or the diversion of the partial payment therefor. This court ruled that

the law is well-settled that the "... liabilities of joint adventurers are governed, in

general, by rules which are similar or analogous to those which govern the corresponding ... liabilities of partners, except as they are limited by the fact that the scope of a joint adventure is narrower than that of the ordinary partnership. Accordingly, as a general rule, each of several joint adventurers has power to bind the others and to subject them to liability to third persons in matters which are strictly within the scope of the joint enterprise. Thus, a member of a joint adventure can bind his associates, whether disclosed or undisclosed, by such contracts as are reasonably necessary to carry on the venture." (30 Am.Jur. § 41, p. 699.).... Each member of a joint venture acts individually and as agent for other members within the general scope of the enterprise or in furtherance of the business in which they are engaged. Being closely akin to a partnership, the law of partnership and principal and agent underlies the conduct of the venture and governs the rights and liabilities of the joint venture, and of third parties as well....

The obligations of sale, delivery and warranty incurred in the case at bar as to 1500 tons of cast-iron scrap obviously related to matters strictly within the scope of the joint venture to sell scrap iron and were reasonably necessary to carry on the venture in furtherance of the common enterprise. In fact, they fulfilled the very purpose for which the venture was created. That these obligations were binding on the [defendant] corporation and on the [defendant] copartnership as joint adventurers is irrefutable under the principles above enunciated and under all the equities of the case....

It is no defense to say that the [defendant] copartnership was undisclosed or that the [defendant] corporation purported to sell its own property and the [plaintiff] purchased on that assumption without knowledge of the joint venture, the test being that the sale was within the scope and authority of the joint venture as well as in furtherance of the business in which the joint adventurers were engaged. (*See Proctor v. Hearne,* [100 Fla. 1180, 131 So. 173 (Fla.1930) ].) Neither can the [defen-

dant] copartnership avoid liability because it had no actual knowledge of the sale at the time it was made, the knowledge of one joint adventurer acting within the scope and authority of the joint venture being the knowledge of all and what would bind the one would bind the others. (*See Robertson v. Merwin,* [154 A.D. 723] 139 N.Y.S. 726 [ (1913) ].) Nor can it do so because the [defendant] corporation secretly pocketed the partial payment of $35,000 on executing the sale and the [defendant] copartnership received no benefit therefrom, it having the right to share therein upon an accounting with its coadventurer as well as in the final payment of $40,000 on delivery of the entire 1500 tons of cast-iron scrap sold had the contract been fully performed.

The written agreement for sale and delivery and supporting bill of sale are thus binding upon the [defendant] copartnership to the same extent as they are on the [defendant] corporation, even though [defendant] corporation may have perpetrated a fraud upon the [plaintiff] and even though the [defendant] copartnership may be innocent of that fraud. The underlying principle of partnership and principal and agent controls, so that one joint adventurer is liable for the fraud of the other within the scope and authority of the joint venture....

*Eastern Iron,* 39 Haw. at 356–58 (some ellipsis points added and some in original) (some citations omitted). The defendants in *Eastern Iron* were held jointly and severally liable for damages to the plaintiffs. *Id.* at 360.

■ The circumstances in the present matter are analogous to those in *Eastern Iron.* There is undisputed evidence in the record that Weimer and Kim, acting on behalf and in furtherance of the business of the joint venture comprised of Kailua Partners and Kailua Estates, entered into limited partnership agreements with the plaintiffs, received consideration therefor, and diverted the money, thereby damaging the plaintiffs. The degree of Au's and Hewitt's participation in the scheme is disputed. The plaintiffs adduced evidence, in the form of correspondence with Weimer and Kim, that suggests

that Au had notice of irregularities in the handling of the partnerships' affairs as early as 1991. Au asserted that he had made a $25,000.00 loan to Kailua Partners and Weimer, to be repaid within twelve days, which was actually repaid approximately three months later out of funds received from one of the plaintiffs, during the period of time when payments were being made by the joint venture to the landowners and the agreement to purchase the land intended for development by the joint venture was being cancelled. The record is unclear with respect to the circumstances of these transactions and Au's involvement in them. But, in any event, lack of actual knowledge of wrongdoing and innocence of fraud, in themselves, do not absolve one joint venturer of liability for the fraud of another joint venturer acting within the scope and authority of the joint venture. *See Eastern Iron,* 39 Haw. at 356–58.

The Uniform Partnership Act, enacted in 1972 as HRS ch. 425, part IV,[22] *see* 1972 Haw. Sess. L. Act 17, §§ 1 through 45 at 174–87, retained the common law principles of partnership liability. *Cf., e.g., Head v. Henry Tyler Constr. Corp.,* 539 So.2d 196, 197–99 (Ala.1989); *Catalina,* at 72–75, 800 P.2d 574; *Hartford Accident & Indem. Co. v. Scarlett Harbor Assoc.,* 109 Md.App. 217, 674 A.2d 106, 130–33 (1996); *Wayne Smith Constr. Co. v. Wolman, Duberstein & Thompson,* 65 Ohio St.3d 383, 604 N.E.2d 157, 160–63 (1992). The relevant statutory provisions, HRS § 425–13 (1993) through 425–15 (1993), provide:

§ **425–113. Partnership bound by partner's wrongful act.** Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of the partner's co-partners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act.

§ **425–114. Partnership bound by partner's breach of trust.** The partnership is bound to make good the loss:

(a) Where one partner acting within the scope of the partner's apparent authority receives money or property of a third person and misapplies it;

(b) Where the partnership in the course of its business receives money or property of a third person and the money or property so received is misapplied by any partner while it is in the custody of the partnership.

§ **425–115. Nature of partner's liability.** All partners are liable:

(a) Jointly and severally for everything chargeable to the partnership under sections 425–113 and 425–114.

(b) Jointly for all other debts and obligations of the partnership; but any partner may enter into a separate obligation to perform a partnership contract.

■ As noted *supra* in section III.B, the record reflects that Kailua Partners and Kailua Estates formed a joint venture to develop a parcel of land. A joint venture is a partnership under the Hawai'i partnership law. *See supra* note 19. Au and Hewitt were participants in the joint venture and, therefore, general partners thereof.

Partnership law does not distinguish between "passive" general partners and "active" general partners. *See* [HRS] § 425–109(1) [ (1993) ] ("Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership

---

**22.** 1999 Haw. Sess. L. Act 284 replaced HRS ch. 425, part IV with a revised version of the Uniform Partnership Act, effective July 1, 2000. *See supra* note 19. The revised Act provides that "all partners are liable jointly and severally for all obligations of the partnership unless agreed by the claimant or provided by law." HRS § 425–117(a) (Supp.2000). Thus, it abrogates the common law distinction between general partners' liability for a partnership's obligations in contract and tort. The version of HRS ch. 425, part IV applicable to our review of the circuit court's decision in this matter is the Uniform Partnership Act enacted by the legislature in 1972, as amended prior to 1999. However, we note that the record reflects that the plaintiffs in the present matter are judgment creditors of Kailua Partners and Kailua Estates, and their ability to satisfy the judgment from the assets of individual partners may be affected by the revision. This issue, however, is not before us in the present appeal.

name of any instrument, for apparently carrying on in the usual way the business of the partnership of which the partner is a member binds the partnership...."); *Crane & Bromberg on Partnership* § 24A, at 141–42 (a dormant partner "is nonetheless a partner, liable for firm obligations like other partners"). Moreover, an individual partner's ignorance of a particular event or transaction ordinarily does not relieve him of responsibility for an action undertaken on behalf of the partnership: "[n]otice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter ... operate as notice to or knowledge of the partnership...." [HRS] § 425–112 [ (1993) ].

*Great Hawaiian Financial Corp. v. Aiu*, 863 F.2d 617, 621 (9th Cir.1988) (interpreting Hawai'i partnership law) (ellipsis points in original) (some brackets added and some in original). Thus, Au and Hewitt are liable for any tortious wrongdoing of their copartners, acting in the course of the business of the joint venture, committed against third persons regardless of their (*i.e.*, Au's and Hewitt's) degree of involvement in the management of the enterprise. They are liable jointly and severally with other partners for any losses incurred by third persons resulting from such tortious acts. HRS §§ 425–114 (1993) and 425–115 (1993) address this liability when the loss is caused by a partner's misapplication of money received on behalf of the partnership and, therefore, apply directly to the present matter.

Au argues, however, that the liability of an innocent general partner for losses caused by other general partners' misconduct does not extend to limited partners in the partnership. He relies on *Kazanjian v. Rancho Estates, Ltd.*, 235 Cal.App.3d 1621, 1 Cal.Rptr.2d 534 (1991), and *Monetary Group v. Barnett*, 2 F.3d 1098 (11th Cir.1993).[23] The *Kazanjian*

court articulated the question before it as follows:

> When a limited partner suffers loss because of the misappropriation of partnership funds by one general partner, is the other general partner liable jointly to the limited partner for such loss? Surprisingly, this question seems not previously to have been answered, either in terms of provisions of the uniform partnership acts or by judicial decision.

*Kazanjian*, 1 Cal.Rptr.2d at 536. The *Kazanjian* court then answered the question in the following fashion:

> At the outset, we dismiss arguments based upon classification of the tortious partner's acts as either within or outside the scope of business of the partnership. It may be presumed that the typical partnership agreement will hardly ever contain a provision authorizing misappropriation of partnership funds by a general partner.[24] ... On the other hand, it is clear that tortious acts done in connection with, or in the process of, the business of the partnership will subject the general partners to liability to creditors. (*See Blackmon v. Hale* (1970) 1 Cal.3d 548, 83 Cal.Rptr. 194, 463 P.2d 418; innocent partner in law firm liable for misappropriation of client trust funds by co-partner). However, the fact that a misdeed will subject all partners to liability to a creditor does not necessarily mean the misdeed causes equal liability to a losing limited partner.
>
> We state the obvious when we remind that a limited partner in his capacity as a limited partner is not a creditor. To find what the limited partner's rights are we look to the Revised Uniform Limited Partnership Act, [ (HRS ·§ 425D–403(b)) ]: "... Except as provided in this chapter or in the partnership agreement, a general partner of a limited partnership has the liabilities of a partner in a partnership

---

**23.** A third case that Au cites, *Johnson v. Weber*, 166 Ariz. 528, 803 P.2d 939 (Ct.App.1990), is inapposite, inasmuch as it does not involve allegations of wrongdoing, dishonesty, or disloyalty, but, rather, the question of the liability of a "passive" general partner to a limited partner for inadequate, and allegedly negligent, management of the partnership by another general partner.

**24.** *Kazanjian* distinguished *Reynolds v. Mitchell*, 529 So.2d 227 (Ala.1988), which held two general partners liable to their limited partners for misrepresentations of a third general partner, on the grounds that those misdeeds were committed in the ordinary course of the partnership's business. *Kazanjian*, 1 Cal.Rptr.2d at 537 n. 4.

without limited partners to the partnership and to the other partners."

The word "partner" in the California Revised Limited Partnership Act means both a general and a limited partner. [ (HRS § 425D–101).] Literally, therefore, except as particularly provided otherwise either by the agreement or the act, the liability of a general partner to a limited partner is identical to his liability to another general partner.

The obligations of a misappropriating partner are set forth in Uniform Partnership Act section 21, subdivision (1), [ (HRS § 425–121) ]: "Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners. . . ." It is notable in this reading that the accounting is to the partnership, rather than to individual co-partners. It is also to be noted that the misappropriating partner holds "as trustee" the profits improperly derived. Partnership law thus incorporates the fiduciary concepts generated in trust law. (*See Tri–Growth Centre City, Ltd. v. Silldorf, Burdman, Duignan & Eisenberg* (1989) 216 Cal.App.3d 1139, 1150, 265 Cal.Rptr. 330: "[W]hen a partnership is created, the parties acquire rights and duties based on a fiduciary relationship.")

*Id.* at 536–37 Relying on the law of trusts, the *Kazanjian* court concluded that "co-trustees, and hence also co-partners, are not liable for loss caused by misdeeds of their co-fiduciaries unless they are personally in some way at fault—either by participating in the tort through consent or otherwise, or by negligence in permitting it to occur." *Id.* (citations omitted). Although an innocent general partner was not jointly and severally liable with a malfeasant general partner for misappropriations that caused loss to a limited partner, the *Kazanjian* court held that the limited partner was entitled to partial compensation for his loss from the innocent general partner based upon concepts of partnership contribution. *Id.* at 537–38.

The *Kazanjian* court acknowledged that

[t]he limited partner is, in some respects, like a creditor of the partnership.

Like the creditor, the limited partner has no control of the partnership business. He is entirely dependent upon the general partners for the care and protection of his investment. One could posit the proposition that the nature of a limited partnership is that of a general partnership (composed of the several general partners) who together are in business for the objective of returning a profit to the limited partner. Such concept would impose on all general partners the obligation of protection of the limited partner and joint and several liability for the misappropriation by any general partner.

*Id.* at 538. However, it felt compelled by the statutory framework created by the California uniform partnership acts to limit the scope of general partners' liability. It stated:

The Uniform Limited Partnership Act, first adopted in 1916, was based upon two fundamental assumptions. The first assumption was that public policy did not require limited partners to become bound for partnership obligations. The second was: "That persons in business should be able, while remaining themselves liable without limit for the obligations contracted in its conduct, to associate with themselves others who contribute to the capital and acquire rights of ownership, provided that such contributors do not compete with creditors for the assets of the partnership." (6 *West's U. Laws Ann.* (1969) U. Limited Partnership Act, § 1, comrs. note, p. 564, emphasis added; *see also* 2 Barrett & Seago, *Partners and Partnerships, Law and Taxation* (1956) Limited Partnerships, § 1.2, p. 490; 2 *Rowley on Partnership* (2d ed. 1960) Limited Partnerships, § 53.0, p. 551.)

Thus, it appears that the key differences between the limited and general partners are (1) limitation of liability of the limited partner to his investment, in return for which (2) the limited partner relinquishes all right of business management. The limited partner remains a "partner" in the sense that he participates in profits and losses of the business. It does not seem violative of this status to deny the limited

partner the guarantee of all general partners of the propriety of the acts of each of them. Innocent general partners, *inter se,* are obviously not responsible for the misdeeds of one of their number. . . . Nothing to the contrary appearing in the uniform acts, there would appear no good reason for modifying this rule of nonliability for the claims of loss of a limited partner.

*Id.* at 538.

The analysis of the California Court of Appeals in *Kazanjian* is primarily applicable to limited partnerships comprised of general and limited partners who are dealing with each other on equal terms. It emphasizes that the limited partners' status is achieved through a fair exchange: the relinquishment of the right to participate in management of the partnership for limitation of liability. Thus, the reasoning of the *Kazanjian* court is premised upon the assumption that "the limited partner remains a 'partner,' " at least for the purposes of determining liability as between the limited and general partners, effectively treating a limited partner as the functional equivalent of a general partner for certain purposes. Nevertheless, the *Kazanjian* court appears to have acknowledged the potential inequity of such an approach by fashioning a partial remedy for the defrauded limited partner.

In the present matter, in which parties of unequal bargaining power and sophistication are involved, the resulting inequity is even more manifest. The position of the limited partners in the present matter is more analogous to a defrauded creditor than to a defrauded general partner. In any event, as noted *supra* in section III.D.1, the Hawai'i Uniform Limited Partnership Act, HRS ch. 425D, cannot govern the rights and liabilities of the parties in the present matter, inasmuch as the general partners failed to register the partnerships pursuant to the requirements of HRS § 425D–201 (1993). Accordingly, even if we were to accept the *Ka-*

*zanjian* analysis with respect to the limited partnerships properly formed in accordance with the applicable provisions of the governing statute, Au's reliance on *Kazanjian* in the present matter is misplaced, and it is of no assistance to him.[25]

We hold, under the circumstances of this case, that the plaintiffs stand in the position of "third persons," rather than "copartners," for the purposes of determining Au's and Hewitt's liability to them, pursuant to HRS §§ 425–113 through 425–115, and, therefore, that Au and Hewitt are jointly and severally liable for any wrongful acts and breach of trust chargeable to Kailua Partners on the basis of Weimer's and Kim's tortious misconduct. The record reflects that the circuit court entered a final judgment in favor of the plaintiffs and against Kailua Partners, Weimer, and Kim on all but one of the counts asserted in the plaintiffs' complaint, *see supra* note 12. That final judgment has not been appealed. Accordingly, we hold that the circuit court erred in entering summary judgment in favor of Au and Hewitt and against the plaintiffs. Inasmuch as the circuit court's judgments in favor of Au and Hewitt and against the plaintiffs must therefore be vacated, the correlative judgments awarding attorneys' fees and costs in favor of Au and Hewitt and against the plaintiffs are also vacated. That being the case, the question whether the circuit court abused its discretion in imposing fees and costs against the plaintiffs jointly and severally is moot.

E. *The Circuit Court Misapplied The Hawai'i Rules Of Civil Procedure In Ruling On The Motion For Sanctions Against The Plaintiffs And Their Counsel.*

 The circuit court imposed sanctions against the plaintiffs' attorney, Yanagida, for failing to appear at certain depositions scheduled by the defendants.[26] Yanagida argues

---

**25.** The United States Court of Appeals for the Eleventh Circuit adopted the *Kazanjian* analysis in *Monetary Group,* upon which, as we have indicated, Au also relies. However, insofar as the limited partnerships at issue in *Monetary Group* were properly formed pursuant to the provisions of the Uniform Limited ·Partnership

Act, Au's reliance upon that decision is misplaced as well.

**26.** The circuit court stated in its sanction order, filed on February 24, 1999, that sanctions were being imposed pursuant to HRCP Rule 11, *see supra* note 2. However, Rule 11 sanctions are limited to pleadings violations, *see generally su-*

that, in imposing the sanctions, the circuit court violated her right to procedural due process because she was neither given notice that the sanctions would be imposed against her nor afforded an opportunity to be heard.

■ Yanagida did not raise the issue of procedural due process in the circuit court. "[W]hen a party fails to raise an issue about the constitutionality of a . . . sanction before the trial court, the reviewing appellate courts may deem the constitutional issue waived." *Bank of Hawai‘i v. Kunimoto*, 91 Hawai‘i 372, 388, 984 P.2d 1198, 1214 (1999) (quoting *Kawamata Farms*, 86 Hawai‘i at 248–49, 948 P.2d at 1089–90) (ellipsis points in original). In any event, Yanagida was, in fact, given reasonable notice that the sanctions could be imposed against her, as well as an opportunity to be heard regarding them.

Due process is not a fixed concept requiring a specific procedural course in every situation. *Sandy Beach Defense Fund v. City Council of the City and County of Honolulu*, 70 Haw. 361, 378, 773 P.2d 250, 261 (1989); *cf. Cafeteria & Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 [81 S.Ct. 1743, 1748–49, 6 L.Ed.2d 1230] . . . (1961). Rather, due process is flexible and calls for such procedural protections as the particular situation demands. *Sandy Beach Defense Fund*, 70 Haw. at 378, 773 P.2d at 261; *Morrissey v. Brewer*, 408 U.S. 471, 481 [92 S.Ct. 2593, 2600, 33 L.Ed.2d 484] . . . (1972). The basic elements of procedural due process of law require notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Sandy Beach Defense Fund*, 70 Haw. at 378, 773 P.2d at 261; *see also Mathews v. Eldridge*, 424 U.S. 319, 333 [96 S.Ct. 893, 902, 47 L.Ed.2d 18] . . . (1976); *North Georgia Finishing, Inc. v. Di–Chem, Inc.*, 419 U.S.

601, 605–06, [95 S.Ct. 719, 721–22, 42 L.Ed.2d 751] . . . (1975).

*Id.* (quoting *Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan*, 87 Hawai‘i 217, 243, 953 P.2d 1315, 1341 (1998) (citations omitted)) (brackets and ellipsis points in original).

■ The circuit court's May 4, 1998 order, finding the plaintiffs' failure to appear for their properly noticed depositions to be a sanctionable violation of its prior order denying the plaintiffs' motion for a protective order, expressly stated that "it was not the Plaintiffs, but, instead, it was Plaintiffs' counsel who committed the wrongful acts[.]" This language put Yanagida on notice that she was the party to be charged.[27] In this connection, Yanagida fails to articulate in any fashion the manner in which she was prejudiced by the fact that the circuit court did not expressly state, prior to the hearing on December 29, 1998, during which it ruled regarding Jorgensen's motion to determine the amount and type of sanctions, that the sanctions were to be borne by her rather than the plaintiffs. She advances no argument, and we are unable to discern any, to suggest that the plaintiffs should have been held responsible for payment of the sanctions. Accordingly, any lack of clarity in the circuit court's order regarding Yanagida's, as opposed to the plaintiffs', liability for the contemplated sanctions was harmless.

■ Moreover, Yanagida was afforded the opportunity to be heard with respect to sanctions at the hearing conducted on January 30, 1998, which was devoted, *inter alia*, to determining whether her conduct in connection with the plaintiffs' depositions was sanctionable. In spite of her assertions to the contrary, Yanagida was also afforded the opportunity to air her position at the hearing conducted on December 29, 1998, when the

---

pra section III.C. "The rule does not purport to be a means for district courts to sanction conduct in the course of a lawsuit, such as failure to comply with court orders, that does not involve the signing of pleadings, motions, or other papers." *Simpson v. Welch*, 900 F.2d 33, 36 (4th Cir.1990). The circuit court's erroneous reference to HRCP Rule 11 is not, however, outcome-dispositive of the propriety of the circuit court's imposition of sanctions *per se.*

27. In a "Memorandum In Opposition To Defendants Gordon Au and Richard Jorgensens' [sic] Motion For Sanctions Against Plaintiffs," filed on December 24, 1998, Yanagida effectively conceded the point by arguing that "[t]he rescheduling was not Plaintiffs' fault but the 'wrongful act' of their counsel[.]"

circuit court announced that sanctions would be assessed specifically against her. The record reflects that, at that point, Yanagida requested a clarification of the circuit court's various rulings of the day, with which request the circuit court complied. Yanagida interposed no objection to the circuit court's announced intention to sanction her at that time, nor did she request a reconsideration in any of her post-hearing motions. Yanagida argues that a denial of due process cannot be corrected, after the fact, via a motion for reconsideration, citing *Schutter v. Soong*, 76 Hawai'i 187, 208, 873 P.2d 66, 87 (1994). However, *Schutter* specifically involved the right to presentence allocution in a criminal proceeding and is therefore distinguishable from the present case. "Due process [being] flexible and call[ing] for such procedural protections as the particular situation demands," *Kunimoto*, 91 Hawai'i at 388, 984 P.2d at 1214, Yanagida was entitled to an opportunity to be heard "at a meaningful time and in a meaningful manner." *Id.* Yanagida was given such an opportunity.

▆ Yanagida further contends that her failure to produce her clients for their depositions, which were set for February 10 through 13, 1998, could not violate the circuit court's February 23, 1998 order denying the plaintiffs' motion for protective order because the motion had sought to "stay any proceedings in this case from February 23, 1998 to April 3, 1998." Thus, Yanagida contends that the circuit court's order could not be the basis for sanctions addressing conduct occurring during a different period of time.

We agree with Yanagida that the circuit court's May 4, 1998 and February 24, 1999 orders erroneously imposed sanctions on her on the ground that she had caused the plaintiffs to violate the court's February 23, 1998 order denying the plaintiffs' motion for a protective order by failing to produce her clients (*i.e.*, the plaintiffs) for their scheduled depositions. A denial of a motion for a protective order is not, in and of itself, tantamount to an order compelling discovery. Indeed, HRCP Rule 26(c) (1998) expressly provides that "[i]f [a] motion for a protective order is denied in whole or in part, the court *may*, on such terms and conditions as are

just, order that any party or person provide or permit discovery." (Emphasis added.) Although a dispute regarding the plaintiffs' deposition schedule persisted for several weeks, no party in the present matter moved for an order compelling discovery pursuant to HRCP Rule 37(a) (1998), which provides generally that "[a] party, upon reasonable notice to other parties and all persons affected thereby, may apply for an order compelling discovery...." The circuit court's February 24, 1999 order imposing the sanctions invoked HRCP Rule 11, which is clearly inapposite. *See supra* note 26. Neither may the sanctions be sustained on the basis of the circuit court's "inherent powers," inasmuch as the circuit court did not enter any finding, either expressly or impliedly, that Yanagida had acted in bad faith. *See Kunimoto*, 91 Hawai'i at 389–90, 984 P.2d at 1215–16 (1999) ("It is well settled that a court may not invoke its inherent powers to sanction an attorney without a specific finding of bad faith.") (Citing *Enos*, 79 Hawai'i at 458–59, 903 P.2d 1279–80.) (Other citations omitted.).

Au and Jorgensen argued in the circuit court, and continue to argue on appeal, that the sanctions were authorized by HRCP Rule 37(b), *see supra* note 9. Insofar as HRCP Rule 37(b) provides for sanctions for failure "to obey an order to provide or permit discovery," the provision is inapplicable under circumstances such as those in the present matter, where no such order was ever entered. *See Kukui Nuts of Hawaii Inc. v. R. Baird & Co., Inc.*, 7 Haw.App. 598, 624, 789 P.2d 501, 517 (1990) ("Under Rule 37(b), failure to comply with a prior discovery order is prerequisite to an award of attorney's fees.") (Citing *Lothspeich v. Sam Fong*, 6 Haw.App. 118, 711 P.2d 1310 (1985).).

In connection with the foregoing, and interpreting the relevant language of FRCP Rule 37(b), which is identical to the language of HRCP Rule 37(b), the United States Court of Appeals for the Seventh Circuit has held that

[a]lthough a motion to compel usually precedes the imposition of Rule 37(b) sanctions, a formal motion is not always necessary. In general, where a party has

received adequate notice that certain discovery proceedings are to occur by a specific date, and that party fails to comply, a court may impose sanctions without a formal motion to compel the discovery from the opposing party. For example, in *Properties International, Ltd. v. Turner*, 706 F.2d 308, 310 (11th Cir.1983), the court affirmed a district court's imposition of sanctions on the ground that the lower court's order that defendants provide the government "with complete discovery" was sufficient under Rule 37(b), since there is "no requirement that the opposing party move for [the Rule 37(b) ] order." Similarly, in *Charter House Insurance Brokers, Ltd. v. New Hampshire Insurance Co.*, 667 F.2d 600, 604 (7th Cir.1981), this court stated that an attorney's promise in open court to produce certain documents "could be treated as the equivalent of an order" for Rule 37(b) purposes. *See also Henry v. Sneiders*, 490 F.2d 315, 318 (9th Cir.), cert. denied, 419 U.S. 832, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974) (Rule 37(b) sanction upheld where district court orally had ordered defendant to produce records, since "[w]here oral proceedings unequivocally give a litigant notice that certain documents are to be produced, the absence of a written order does not preclude the entry of a default judgment for failure to comply."); *Jones v. Uris Sales Corp.*, 373 F.2d 644, 646–47 (2d Cir.1967) (proceedings in judge's chambers, where judge announced that he would give counsel twenty-four hours to produce subpoenaed documents, treated as oral motion and order).

*Tamari v. Bache & Co.*, 729 F.2d 469, 472–73 (7th Cir.1984) (some brackets added and some in original) (affirming sanctions against counsel for client's failure to appear at deposition scheduled pursuant to deposition schedule approved by court at status hearing when court admonished parties during hearing and in minute order that depositions were to be completed by certain deadline and when during discussions with parties in chambers court made clear that client's continued failure to appear for depositions was unacceptable and deadline was firm and final); *see also Lothspeich v. Sam Fong*, 6 Haw.App. 118, 123–24, 711 P.2d 1310, 1314–15 (1985) (circuit court's oral ruling during telephone conference hearing on motion for protective order that inquiry into deponents' assets was relevant, which led to denial of motion, was sufficient basis upon which to seek sanctions for refusal to answer questions regarding assets at deposition pursuant to HRCP Rule 37(b), inasmuch as parties "were fully aware of the court's ruling"); (*Halas v. Consumer Services Inc.*, 16 F.3d 161, 164 (7th Cir.1994)) ("[A] formal, written order to comply with discovery requests is not required under Rule 37(b); an oral directive from the district court provides a sufficient basis for Rule 37(b)(2) sanctions if it unequivocally directs the party to provide the requested discovery."); *McLeod, Alexander, Powell & Apffel v. Quarles*, 894 F.2d 1482, 1484 (5th Cir.1990) (holding that order to compel discovery was not prerequisite to imposing sanctions pursuant to FRCP Rule 37(b) when court had issued docket control order requiring discovery completed by certain deadline to which party sanctioned failed to adhere).

■ The foregoing authorities stand for the proposition that, when a court unequivocally and prospectively notifies a party of a discovery requirement that the court expects the party to obey, the notification may, under appropriate circumstances, be treated as the functional equivalent of an order compelling discovery, even if the court has not expressly designated it as such. However, there was no such unequivocal and prospective notification in the present matter. The circuit court's oral comments made in the course of the January 30, 1998 hearing, *see supra* section I, which were the only remarks of the court that arguably applied prospectively to the depositions scheduled for February 10, 1998 through February 13, 1998, were too ambiguous to constitute unequivocal notification of a firm discovery deadline, a violation of which would trigger sanctions pursuant to HRCP Rule 37(b).

On the other hand, HRCP Rule 37(d), *see supra* note 9, authorizes sanctions for certain discovery violations, including a party's failure to appear at his or her own properly noticed deposition, regardless of whether the

court has previously issued an express order compelling it. *See Aloha Unlimited, Inc. v. Coughlin,* 79 Hawai'i 527, 533, 904 P.2d 541, 547 (App.1995) ("Sanctions can be imposed under HRCP Rule 37(d) without first seeking an order compelling compliance.") (Brackets, internal quotation marks, and citation omitted.). It is undisputed that the plaintiffs did not appear for their depositions noticed by Jorgensen. HRCP Rule 37(d) not only *allows* the court in which the action is pending to impose particularized sanctions against the offending party, but the rule provides in relevant part that "the court *shall require* the party failing to act or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure, *unless* the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." (Emphases added.)

■■■ "A good faith dispute concerning a discovery question can, in a proper case, constitute 'substantial justification' for refusing to give discovery." *Lothspeich,* 6 Haw. App. at 123, 711 P.2d at 1314 (1985); *see also Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) ("[T]he test for avoiding the imposition of attorney's fees for resisting discovery in district court is whether the resistance was 'substantially justified,' Fed. Rules Civ. Proc. 37(a)(4) and (b)(2)(E). To our knowledge, that has never been described as meaning 'justified to a high degree,' but rather has been said to be satisfied if there is a 'genuine dispute,' or 'if reasonable people could differ as to [the appropriateness of the contested action]'.") (Some citations omitted.). Although the circuit court did not enter any formal findings regarding the discovery dispute at issue, for purposes of our analysis, we assume *arguendo* the dispute was a "good faith" one.

■■■ The presence of a "good faith" dispute concerning a discovery question," however, does not end our inquiry in the present case. HRCP Rule 37(d) further provides that "[t]he failure to act described in this subdivision may not be excused on the ground that the discovery sought is objectionable unless the party failing to act has applied for a protective order." *See supra* note 9. As we have noted, the record reflects that the plaintiffs failed specifically to move for a protective order with respect to their scheduled depositions.[28]

As a general rule, a party or person must seek a protective order from the court under Rule 26(c) if he desires not to appear or respond to a discovery request. *See Byrnes v. Jetnet Corp.,* 111 F.R.D. 68, 73 (M.D.N.C.1986); 8 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2116, at 426–27 (West 1970 & Supp. 1988). In most circumstances, objections must be filed before the date of the deposition. *See United States v. Int'l Business Machines Corp.,* 70 F.R.D. 700, 701 (S.D.N.Y.1976); *see also Truxes v. Rolan Electric Corp.,* 314 F.Supp. 752, 759 (D.P.R.1970). Failure to seek judicial relief prior to this date will preclude a later objection. *Wong Ho v. Dulles,* 261 F.2d 456, 460 (9th Cir.1958); *Mitsui & Co. v. Puerto Rico Water Resources Authority,* 93 F.R.D. 62, 67 (D.P.R.1981); (citing *United States v. Portland Cement Co.,* 338 F.2d 798, 803 (10th Cir.1964)); *Truxes,* 314 F.Supp. at 759; *United States v. Int'l Business Machines Corp.,* 79 F.R.D. 412 (S.D.N.Y.1978); *Marriott Homes, Inc. v.*

---

**28.** It is debatable whether Yanagida's representations made in the course of the January 30, 1998 hearing impliedly amounted to an "application for a protective order" within the meaning of HRCP Rule 37(d), but, if they did, the circuit court impliedly denied the application. Given the record before the circuit court at the time of the hearing, the denial of a motion for a protective order with respect to the depositions would not have amounted to an abuse of discretion. We stated in *Harada v. Ellis,* 60 Haw. 467, 481, 591 P.2d 1060, 1070 (1979), that "[i]t is clearly implied in the rule that failure to attend a deposition is not to be excused where a protective order has been denied by the trial court acting within its proper discretion." *See also* Advisory Committee Notes to FRCP Rule 37 1993 Amendments ("The last sentence of this subdivision is revised to clarify that it is the pendency of a motion for protective order that may be urged as an excuse for a violation of subdivision (d). If a party's motion has been denied, the party cannot argue that its subsequent failure to comply would be justified. In this connection, it should be noted that the filing of a motion under Rule 26(c) is not self-executing—the relief authorized under that rule depends on obtaining the court's order to that effect.").

*Hanson,* 50 F.R.D. 396, 400 (W.D.Mo. 1970); 8 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2035 (West 1970 & 1988 Supp.).[29]

*In re Air Crash Disaster at Detroit Metropolitan Airport on Aug. 16, 1987,* 130 F.R.D. 627, 630 (E.D.Mich.1989); *see also East Boston Ecumenical Community v. Mastrorillo,* 133 F.R.D. 2, 3–4 (D.Mass.1990) ("[A] party cannot unilaterally decide that he or she is not going to attend a duly-noticed deposition without at least applying for a protective order before the time set for the deposition."); *In Re Honda,* 106 B.R. 209, 212 (D.Haw.1989) ("[The deponent's letter] objecting to the deposition is not a proper method to excuse itself from appearing at the deposition."). Accordingly, even if there was a "good faith dispute" concerning the deposition schedule in the present matter, its pendency did not "substantially justify" the plaintiffs' failure either to seek a protective order or to attend the depositions. *See* HRCP Rule 37(d).

■ Notwithstanding that Yanagida's failure to produce the plaintiffs for their February 1998 depositions was not "substantially justified," the question remains whether "other circumstances ma[d]e [the circuit court's] award of [sanctions] unjust." *See id.* Although Yanagida's conduct violated the rules governing discovery, the record is essentially silent as to whether the circuit court considered the question.

[S]anctions are not to be assessed without full and fair consideration by the court. They often entail a fine which may have more than a token effect upon an attorney's resources. More importantly, they act as a symbolic statement about the quality and integrity of an attorney's work—a

statement which may have tangible effect upon the attorney's career.

*Enos,* 79 Hawai'i at 458, 903 P.2d at 1279 (brackets in original) (quoting *Simmerman v. Corino,* 27 F.3d 58, 64 (3d Cir.1994)).

When the sanctions award is based upon attorney's fees and related expenses, an essential part of determining the reasonableness of the award is inquiring into the reasonableness of the claimed fees. Recovery should never exceed those expenses and fees that were reasonably necessary to resist the offending action. Schwarzer, [*Sanctions Under the New Federal Rule 11—A Closer Look,* 104 F.R.D 181, 198 (1985) ] .... The measure to be used "is not actual expenses and fees but those the court determines to be reasonable." Schwarzer, *supra* at 203. Implicit in this is the duty to mitigate.

In assessing the damage done, the court should consider the extent to which it is self-inflicted due to the failure to mitigate.

A party having vigorously resisted a baseless claim may therefore find that the court, in making an award, will consider its expenditures to have been excessive.

Schwarzer, *supra* at 200–03.

*In Re Yagman,* 796 F.2d 1165, 1184–85 (9th Cir.1986) (some ellipsis points omitted and some added).

The circuit court quantified the sanctions at issue in the present matter based upon defense counsels' affidavits attesting to attorneys' fees and costs "involved in the motions that were involved with the sanctions as well as the preparations for the ... depositions planned and set." Au's counsel averred to attorneys' fees in the amount of $7,989.33 and costs in the amount of $259.30; Jorgen-

---

**29.** The caveat, of course, is that failure to attend a deposition may be excused, even in the absence of a motion for a protective order, if there has been no opportunity to file such a motion. *See, e.g., United States v. International Business Machines Corp.,* 79 F.R.D. 412, 414 (S.D.N.Y.1978) (citing 8 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2035). Courts have found "substantial justification" for nonattendance on the basis of the deponent's serious illness, *Hyde & Drath v. Baker,* 24 F.3d 1162, 1171–72 (9th Cir.1994), and inconvenience and expense of

traveling, *Speidel v. Bryan,* 164 F.R.D. 241, 244 (D.Or.1996). On the other hand, the courts have rejected such excuses as withdrawal of local counsel, *Lew v. Kona Hospital,* 754 F.2d 1420, 1426–27 (9th Cir.1985), deponent's discharge of counsel, *East Boston Ecumenical Community v. Mastrorillo,* 133 F.R.D. 2, 3–4 (D.Mass.1990), military duty with no leave time available, *Turner v. Anderson,* 376 So.2d 899, 901 (Fla.Ct.App. 1979), and inadvertence, *T.B.I. Industrial Corp. v. Emery Worldwide,* 900 F.Supp. 687, 694 (S.D.N.Y.1995).

sen's counsel averred to attorneys' fees in the amount of $10,534.68 and costs in the amount of $406.80. The circuit court gave no explanation as to how or why it awarded Au $3,439.00 in attorneys' fees and $259.30 in costs and Jorgensen $7,287.68 in attorneys' fees and $303.80 in costs. However, we note, on the face of the affidavits, that the vast majority of the expenses that Au and Jorgensen claimed related to prosecuting their motion for default judgment and sanctions, which the plaintiffs vigorously opposed. We also note that Au's and Jorgensen's claim that Yanagida's infraction entitled them to a default judgment against the plaintiffs was clearly without merit, particularly in view of our determination that Yanagida's conduct did not violate any prior court order. On remand, the circuit court must reassess its award of sanctions against Yanagida and in favor of Au and Jorgensen in light of the foregoing observations.

 It is true that we "may affirm a judgment of the lower court on any ground in the record that supports affirmance." *Canalez*, 89 Hawai'i at 301, 972 P.2d at 304. Under the circumstances of the present matter, however, we deem it appropriate to remand the sanctions issue to the circuit court. The circuit court's sanction order was expressly premised, as we have indicated, upon an alleged violation of a prior order, which, as we have explained, never occurred. Nevertheless, HRCP Rule 37(d) authorized the circuit court to sanction Yanagida in some fashion for discovery abuse. The fact remains, however, that the proper exercise of the circuit court's sanctioning discretion pursuant to HRCP Rule 37(d) implicated quite different considerations than those involved in imposing sanctions for a violation of a prior court order pursuant to HRCP Rule 37(b). *Cf. Yagman*, 796 F.2d at 1187–88 (vacating district court's sanction order against attorney and remanding for reconsideration, where discovery rules, upon which the district court had *not* relied, accorded discretion to sanction attorney for discovery abuses, but FRCP Rule 11 and statute governing multiplication of proceedings, upon which district court *had* relied, did not). Accordingly, we vacate the circuit court's judgments against Yanagida and in favor of Au and Jorgensen

and remand the matter to the circuit court for a redetermination of appropriate sanctions.

## IV. CONCLUSION

Based on the foregoing analysis, we (1) vacate (a) the circuit court's judgments, filed on April 19, 1999, in favor of Au and Hewitt and against the plaintiffs, (b) the circuit court's order, filed on June 19, 1997, to the extent that it dismissed the plaintiffs' derivative claims and imposed sanctions on them, (c) the circuit court's order, filed on February 24, 1998, awarding Au and Jorgensen $11,289.78, and (d) the circuit court's judgment, filed on April 20, 1999, in favor of Jorgensen and against Yanagida and awarding Jorgensen $7,591.48, and (2) remand the case to the circuit court for further proceedings consistent with this opinion.

